[No. 13967.   In Bank. — November 16, 1892.]

IN THE MATTER OF THE ESTATE OF MARY C. SPEN-
CER, DECEASED.

CONTEST OF PROBATE OF WILL — APPEAL FROM ORDER DENYING NEW
TRIAL. — Where there has been a regular contest over the probate of a
will, an appeal lies from an order denying a motion for a new trial of the
contest.

APPEAL — ERRORS WITHOUT PREJUDICE. — The judgment will not be re-
versed upon appeal because of errors occurring during the progress of
the trial, where it appears that the judgment could not have been dif-
ferent had the errors not been committed.

WILL — RIGHTS OF TESTATOR — UNREASONABLE PROVISIONS. — The right of
a testator to dispose of his estate depends neither on the justice of his
prejudice nor the soundness of his reasoning.   He may do what he will
with his own; and if there be no defect of testamentary capacity, and no
undue influence or fraud, the law gives effect to his will, though its pro-
visions are unreasonable and unjust.

ID. — EVIDENCE — MENTAL CAPACITY OF TESTATOR — CAPRICIOUSNESS —
SPIRITUALISM. — Capricious and arbitrary likes and dislikes are not evi-
dences of insanity, nor does evidence that a testatrix was a spiritualist
constitute any proof that she was insane, especially where it does not
appear that any views she may have had on the subject of spiritualism
had anything to do with the making of her will.

ID. — TRIAL OF CONTEST — ERRORS WITHOUT PREJUDICE. — The action of
the trial court will not be reversed for alleged errors of law committed
during the trial of the contest of a will, where it appears that no preju-
dice could have resulted to the appellant.

ID. — CHARGE TO JURY — QUOTATIONS FROM DECISIONS. — It is not error for
the trial court, in charging the jury, to quote from decisions of courts in
other cases, if the quotations correctly state the law.

ID. — CHARGE AS TO ABSENCE OF COUNTER-EVIDENCE — HARMLESS ERROR.
— In a contest over the probate of a will, where the execution of the will
is fully and clearly proven, and there is no evidence to the contrary, a
charge to the jury that there is no evidence tending to show that the
will was not executed and attested according to law is not prejudicial
error, even if it be construed as a charge upon a matter of fact.

APPEAL from an order of the Superior Court of Sonoma
County denying a new trial in a contest over the pro-
bate of a will.

The facts are stated in the opinion of the court.

*Henley & Oates*, for Contestant and Appellant.

*A. B. Ware*, for Proponent and Respondent.

*T. J. Geary*, for Minor Heirs and Respondents.

McFARLAND, J. — This is an appeal from a probate order denying a motion for a new trial in a contested will case. Counsel for respondents argue very elaborately that the said order is not appealable; but although the provisions of the code about appeals from probate orders are not as clear as they might be, it must be held as settled practice since the decision in the *Estate of Bauquier*, 88 Cal. 302, that when there has been a regular contest over the probate of a will, an appeal lies from an order denying a motion for a new trial.

Mary C. Spencer died in January, 1888. In September, 1884, she made a will, duly executed, in which she gave all her property, except five dollars, to her daughter, Ida McDannel, and May McDannel, the infant daughter of the said Ida, with a provision also for other daughters. of said Ida, if any such should thereafter be born. At. the date of the will said Ida McDannel was the only living child of said testatrix.

There had, however, been another child of the testatrix, a son named Homer T. Spencer, who had died before the date of the will. He had married a lady whose maiden name was Ella Murphy; and there had been born to said Homer and Ella a son named Rufus Homer Spencer, who at the date of the will was about one year-old. To this son the testatrix gave by her will five dollars; and he, by his guardian, contested the probate of the will, upon the ground that at the time the will was made " she, the said Mary C. Spencer, was not of sound and disposing mind." (There were other grounds of contest, which need not be noticed.) The main issue was submitted to a jury, who found in favor of the validity of the will, and judgment was entered admitting it to probate. The contestant made a motion for a new trial, which was denied, and he appeals from the order denying his motion.

The record presents nearly one hundred alleged errors committed by the court in ruling upon the admissibility of evidence, and in instructing the jury. Some of these will be briefly referred to hereafter; but it is difficult to

XCVI. CAL.—29

conceive how the verdict and judgment could have been
different if the court had ruled throughout the trial as
asked by appellant. And in such a case a judgment will
not be reversed even though some errors have occurred
during the progress of the trial. (*In re Briswalter*, 72
Cal. 107; *Green* v. *Ophir Co.*, 45 Cal. 522; *Levitzky* v.
*Canning*, 33 Cal. 299.)

There is no pretense that Mrs. Spencer was of un-
sound mind in any general sense. It appears clearly
that she was a woman of excellent judgment and discre-
tion in the ordinary affairs of life. She must have had
exceedingly good business capacity; for, thrown suddenly
on her own resources with but little property, and that
heavily encumbered, she managed to raise her children
well, giving her son, at least, an expensive education,
and to accumulate quite a little fortune. None of her
friends and acquaintances who had known her for many
years — and there were more than a score of them who
testified — ever had a suspicion of her insanity.

It is claimed, however, — and this is the main conten-
tion in the case, — that she was insane in one particular,
namely, in her dislike to her daughter-in-law, Ella, the
mother of contestant.

There is no doubt that the testatrix had a dislike of
her daughter-in-law; but there is no evidence that would
have justified the jury in finding that such dislike was
the result of an insane delusion, or any form of insan-
ity. She disliked Ella's family. She had a notion that
the Murphys were beneath her, morally and socially.
Whether or not this notion was well founded is imma-
terial. She had a very high estimation of the worth of
her son, Homer, and was very much attached to him.
She had raised him very carefully, and had expended a
great deal of money, for a woman in her circumstances,
on his education. He appears to have been a bright
and promising young man, and her motherly affection
no doubt somewhat exaggerated his virtues. She ex-
pected him to cut quite a figure in the world. When
she discovered the probability of his marrying, at the

early age of twenty-one years, a member of what she
considered an inferior family, to which she had a great
aversion, she was greatly chagrined and provoked. The
circumstances of the marriage also added to her discom-
fiture. It was not supposed that the marriage would
take place at any early date; but the family of the
daughter-in-law having removed to San Francisco,
Homer went there from Santa Rosa, somewhat hur-
riedly, and was married to Ella without the knowledge
of the testatrix. She did not hear of it until a consid-
erable time afterwards, and then learned of it accident-
ally. Ella testified that this was not the fault of herself
or her family; that he had informed his mother, and
that the latter was expected at the wedding. Neverthe-
less, the mother was not so informed. One or two wit-
nesses — not intimate friends of the testatrix, however,
— testified that she said that Homer was entrapped into
the marriage. If she did make such a statement, it
was not, under the circumstances, any evidence of an
unsound mind. A couple of weeks after the marriage,
Homer and Ella visited Santa Rosa for a week, and did
not go to see Mrs. Spencer. Afterwards the latter made
overtures for a reconciliation. She wrote to Homer,
asking him and Ella to visit her and attend the chris-
tening of her granddaughter May McDannel. Ella re-
plied coldly, refusing the invitation. She testified at
the trial that the letter was written at Homer's request.
Afterwards there was a partial reconciliation. Homer
coming of age, his mother wanted him confirmed, ac-
cording to the custom of the Episcopal Church; and
upon her invitation, Homer and Ella visited her, and
she, at that time, treated Ella kindly. Soon thereafter,
Homer lost his health and his mother went to San Fran-
cisco and helped to nurse him. Afterwards he was
removed to her home at Santa Rosa, where he died.
During his last illness, his mother and Ella were brought
into contact, and did not get along very well. After
the funeral of Homer, they never saw each other. Ella
never sent the grandchild to see the grandmother.

There is nothing in the evidence against the character of Ella, but she evidently did not make much effort to effect a reconciliation with her mother-in-law.

The foregoing is only a meager statement of the history of the relations between the persons named; but taking all the details as they appear in the long transcript, there is nothing to show anything like mental unsoundness or monomania on the part of the testatrix. It is quite probable that the conduct of Homer in various matters caused her to attach blame to Ella, when it should have fallen on Homer himself; but she did not know the real facts. She believed the son, whom she loved, rather than the daughter-in-law, whom she disliked and mistrusted; but would not any sane mother, under the circumstances, have done the same? The likes and dislikes of human beings — their confidences and mistrusts — are often capricious and arbitrary; but they are not evidences of insanity because they cannot be logically defended to the satisfaction of those who think them wrong. In the case at bar there is no warrant for the claim that the testatrix's dislike of her daughter-in-law and her family was an insane delusion; it was simply such a feeling, arising out of the recondite principles of attraction and repulsion, as is quite common among people of undoubted sanity. And it can hardly be said even that the will was in any way unreasonable. She was much attached to her only living child, Mrs. McDannel, and to the infant daughter of the latter; she had a partiality for girls, saying that boys could take care of themselves; she had been offered no opportunity of becoming attached to the contestant, as he had been kept away from her; and it is not improbable that she thought he would be provided for by other relatives. But even if we could consider the will as unjust, it would make no difference. In disposing of her property, she was not called upon to consult the wishes or views of juries or courts; her own will was supreme. "The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his

reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust." (*Jackson* v. *Jackson*, 39 N. Y. 157.)

There is some claim made that Mrs. Spencer was a spiritualist, and therefore insane. In the first place, the evidence does not show that she was a spiritualist, but merely that at one time she took an interest in investigating spiritualism, and was disposed to accept some of its claims. She always remained a member of and devoted adherent to the Episcopal Church. In the second place, spiritualism is not itself insanity. And in the third place, there is not the slightest evidence that any views which she may have had on the subject of spiritualism had anything to do with the making of her will.

It was testified by one or two witnesses — not intimate friends of the testatrix — that Mrs. Spencer said that contestant was not Homer's child. It is clear, however, that she had no such belief. She always recognized him as Homer's son, offered to raise and educate him, and declared him in her will itself to be such son. But if she had once or twice made the statement sworn to, it would have been, under the circumstances appearing in the transcript, no evidence of insanity, although it would have been undoubtedly a mistake.

What Mrs. Spencer is reported to have said about excessive sexual indulgence needs no comment.

With respect to alleged errors in law committed at the trial, we are not able to see any that could have been at all prejudicial to appellant. To many of the rulings no exceptions were taken. Contestant put a long question, covering six or seven pages of the printed transcript, to his witness Dr. Smith. It contained a number of things which the witness knew about Mrs. Spencer from his own acquaintance with her, and a great many other propositions put in a hypothetical form. An objection to this question was sustained, and there was no exception to this ruling. Afterwards, an objection was

sustained to a somewhat similar question, on the ground that the facts within the witness's knowledge should be separated from the hypothetical part of the question, and exception was taken. But the witness then went on and testified, both as to his knowledge of Mrs. Spencer and as to his opinion upon the hypothetical statement, and it cannot be seen how the ruling of the court was of any consequence. Most of the other exceptions to the rulings on evidence were where appellant sought to prove declarations of Homer, made to his wife and others. All this was clearly hearsay and immaterial, and the rulings of the court were correct. It was offered mainly to explain and vindicate the conduct of Ella; but her conduct and character were not on trial. Moreover, she did afterwards testify very fully as to the matters first excluded. We perceive no other rulings on the admissibility of evidence which need special notice.

We have carefully examined the lengthy charge of the court to the jury, including what the court said of its own motion, and instructions given at request of parties. It covers about thirty-five pages of the printed manuscript; and it is a difficult task to construct a charge of that length without including in it some errors. In the present case, however, a great deal of the charge is repetition of the same matter, and it is sufficient to say that a close inspection of it discloses no material error. It is not error for a court, in charging a jury, to quote from decisions of courts in other cases, provided the quotations correctly state the law. It is contended that the court erred in instructing that "there is no evidence tending to show that said instrument [the will] was not executed and attested according to law." If it be conceded that this was erroneous, as charging in respect to a matter of fact, still, as the execution of the will was fully and clearly proven, and there was no evidence to the contrary, no possible harm could have been done by the instruction. In such a case the verdict will not be disturbed. (*Levitzky* v. *Canning*, 33 Cal. 299; and *Green* v. *Ophir Co.*, 45 Cal. 522.) Of the instructions asked by

appellant, twenty-one were refused, and the refusal of each one is assigned as error. We have examined these rejected instructions, and find that those parts of them which are correct appear in the instructions given. Two other instructions asked by appellant were slightly amended by the court, and then given, and we see no errors in the amendments. In instruction No. 25, the word "yes" is used, by mistake, instead of "no"; but the instruction itself and the other instructions show clearly that the mistake was merely one of inadvertence, and it could not have misled the jury.

We see no reason for more particular comment upon the numerous assignments of error; for the evidence against the soundness of the testatrix's mind at the time of the execution of the will was so slender that the verdict must have been the same under any rulings which a respectable court could have been expected to make.

The order appealed from is affirmed.

GAROUTTE, J., DE HAVEN, J., SHARPSTEIN, J., PATERSON, J., and HARRISON, J., concurred.