[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 368 
This is a will contest. Grace Y. Johnson, a spinster, died at Detroit, January 24, 1942, at the age of 67 years, and her will, executed at Windsor, Ontario, April 3, 1940, was presented to the probate court for Wayne county. Contestant and appellant Robert C. Bullard, a nephew, objected to its *Page 369 
admission on the ground that the testatrix was not mentally competent to make a valid will. On his request the contest was certified to the circuit court, Act No. 288, chap. 1, § 36, Pub. Acts 1939, as amended by Acts Nos. 26 and 176, Pub. Acts 1941 (Comp. Laws Supp. 1943, § 16289-1 [36], Stat. Ann. 1943 Rev. § 27.3178 [36]).
At the conclusion of contestant's proofs and again at the conclusion of all proofs, the proponents moved for a directed verdict sustaining the will. The trial court reserved decision on such motions and submitted the case to the jury, which returned a verdict for contestant. On proponents' motion, the trial court granted judgment non obstante veredicto sustaining the will. Contestant appeals, and in considering such judgment, we view the testimony in the light most favorable to contestant. In reFrazee's Estate, 307 Mich. 404; In re Estate of Miller,300 Mich. 703.
Contestant claims that testatrix, his aunt, lacked testamentary capacity; and that he was omitted from her will because she had an insane delusion and false belief that he was a worthless character and was trying to get her money and property. He contends that the testimony presented an issue of fact for jury determination as to her mental condition; that the testimony supported the jury's verdict against the will; and that the trial court erred in granting judgment non obstante veredicto.
Proponents contend that no issue of fact was presented and that the will was valid as a matter of law.
The presumption is that testatrix had mental capacity to make the will in question, 3 Comp. Laws 1929, § 14212 (Stat. Ann. § 27.907); In re Getchell's Estate, 295 Mich. 681; In reBarlum's Estate, 240 Mich. 393. The burden of proof was upon contestant to show by competent evidence that she did not *Page 370 
have such capacity, In re Wawrzyniak's Estate, 297 Mich. 520;In re Getchell's Estate, supra; In re Rowling's Estate,291 Mich. 218.
The testatrix had been reared in a refined home environment and had traveled quite extensively. She lived in Hillsdale, Michigan, until about 10 years preceding her death, when she moved to Detroit. She had inherited a substantial estate and at the time of her death owned income-producing real estate in Hillsdale and Detroit, and in Windsor, Ontario. In April, 1940, while visiting in Windsor, she went to the office of a local attorney who, in pursuance of her instructions, prepared the will in question. At the time she executed such will, her nearest of kin were a sister Ella R. Bullard, the contestant nephew who resided in Detroit, and a nephew and niece who resided in the State of New York. After providing for payment of her debts and funeral expenses and making a specific bequest of her library, the will devised and bequeathed all the rest, residue, and remainder of her estate to one James B. Holes, a druggist of Hillsdale, in trust for the following uses and purposes:
"To pay to my sister Mrs. Ella R. Bullard, of Buffalo New York State, the sum of $15, per week, so long as she shall live, out of the income; provided that if the income shall not be sufficient, then so much of the principal shall be used as may be necessary to cover the deficiency. (Said sister died in May, 1941, preceding the death of testatrix).
"Upon the death of my sister aforesaid the net income shall thereafter be paid over to the Humane Society for the community of Hillsdale, Michigan, U.S.A. for the purpose of an ambulance, or if suitable therefor the conversion thereto of my said automobile, to be used in the general work of the said society in collecting and impounding stray and undesirable animals and humanely disposing of them *Page 371 
If no such organization shall then exist in the said county of Hillsdale, then my trustee shall pay over the net income to a responsible organization or group which shall undertake to carry out the terms of this provision, and which, in the judgment of my said trustee shall be qualified to do the said work.
"Should my aforesaid sister predecease me, then and in that event the whole of the net income of my estate shall forever thereafter be turned over by my said trustee to the Humane Society for the county of Hillsdale, or others as aforesaid, to carry out the work hereinbefore outlined. * * *
"The trustee shall forever hold and manage the property as a trust fund," (and is given usual power to sell and reinvest).
There was no medical testimony as to the mental condition of testatrix. The testimony tending to sustain the will indicates that she attended to her business affairs, knew what properties she owned, purchased additional properties, made repairs, collected rents, gave receipts, and paid bills; that she listened to the radio and could discuss radio programs and speeches intelligently. It appears that she was dissatisfied with the provisions of a former will in which a Detroit attorney had designated himself as sole executor. The Windsor attorney who prepared the will in question testified in part:
"I never met Miss Johnson before the day she came in to have this will drawn. * * * I recall who brought her to my office. An old client of mine by the name of Mrs. La Marsh. * * *
"She (testatrix) was in my office altogether about an hour that day. She dictated what she wanted me to put in the will and I rearranged it * * * and brought it in to her, asked her to read it; she read it over and I asked her if there were any corrections, she said no. * * * I * * * asked her then to * * * sign it and she did so. Both *Page 372 
Mr. Little and I were there at the time and we put our signatures on it as witnesses. * * *
"Q. Did this lady say anything to you about her nephew, Robert Bullard (contestant), being a worthless drunkard, or words to that effect, as to why she was cutting him off from her inheritance? * * *
"A. I asked her, * * * `Haven't you got any relatives,' and she said, `Yes, I have.' I said, `Are you not leaving them anything?' And she said no. She seemed to be a woman of very strong prejudices.
"Q. What did she say why she was not leaving Robert (contestant)?
"A. She said — I don't know which relative it was, it was one of the nephews that she referred to, and she said, `He had been trying to get money out of me for a long time, and I am spending everything I get. Nobody is going to get anything and I am not going to leave them anything.'
"Q. Didn't she say that he was a drinker?
"A. I can't recollect the exact expression, but she gave me to understand that he was a worthless character.
"Q. In the way of his drinking habit she referred to?
"A. I can't remember whether it was drink or what it was — that he couldn't work or something. Anyway, she seemed to be prejudiced against him because he was trying to get money out of her. That is what she told me. I did not make a list of all the relatives of this woman. She didn't seem to want me to be interested in them at all."
The evidence tending to defeat the will indicated that testatrix lived and conducted herself in a rather eccentric and abnormal manner. There was testimony that, as a young woman, she had made several trips to England and while there on one occasion was thrown into jail because of her militant activities *Page 373 
in the suffragette movement. In the later years of her life her principal interest appears to have been in dogs and cats, which were given free use of her home and premises. Witnesses testified that her house was seldom cleaned and was always in a dirty, unsanitary condition and "smelled terrible;" that it was littered with filth and refuse and the leavings of the dogs and cats; and that after drowning a litter of kittens, she burned them in the stove. There was testimony that her person and clothing were unclean and unkempt; that in the winter she wore long woolen underwear, rubber boots, and other items of male clothing; that in the summer she went barefooted and that she usually slept at night in the same clothing she wore in the daytime. She smoked pipes, cigars, and cigarettes. Witnesses testified that she had extra and unnecessary doors, stairways, and partitions built in the home which she occupied; that she bought large quantities of household furniture and cooking utensils which she did not use or need and which she stored in her home and in other buildings; and that on trips to Windsor, Ontario, she failed to declare dutiable items in her possession. Several witnesses testified that she usually failed to complete a subject of conversation and changed from one uncompleted subject to another.
There was testimony indicating that testatrix was strong minded and very decided in her desires and opinions. Contestant himself admitted:
"She had a will of her own, you couldn't influence her. In other words, if she made up her mind she wanted to do something it was rather a waste of time to argue with her. In other words, we can assume that anything she did was her own doings and none influenced her in any way." *Page 374 
Contestant's wife testified in part as follows:
"You couldn't really talk with Grace (testatrix), because she would say something to you before you could answer out to her; she was asking or talking about some other subject, she was off on one thing to another.
"She was a woman that had a very strong nature and expect to have her own way. * * * If she would get an idea she would follow it through."
The Windsor attorney who prepared her will said, "She seemed to be a woman of very strong prejudices." Mrs. La Marsh, a close friend, testified that "once Miss Johnson got an idea in her head you couldn't change her, I never tried to. I used to humor her. * * * She had a mind of her own. * * * At times she had a will of her own."
The testimony indicated that contestant Bullard was an industrious, sober person who had worked continuously 27 years for the Ford Motor Company; that a friendly relation existed between testatrix and contestant and his wife; that he assisted her in many ways; that despite the unsanitary condition of her home, he and his wife often visited her; that despite her personal appearance and conduct, he and his wife often invited her to their home for dinner; and that he treated her in as kindly a way as could reasonably have been expected.
In her manner of living, personal habits, and acts and doing, testatrix certainly deviated from the usual or normal conduct of people. However, we have held that eccentricities and deviation from usual conduct do not necessarily imply mental incompetency. In the case of In re Littlejohn's Estate, 239 Mich. 630, 632,633, we said:
"Lay witnesses told of testatrix's habits of personal untidiness in her last years, of her failing to *Page 375 
exhaust subjects of conversation, of her arbitrary and dictatorial manner towards her maids, and of her extreme particularity relative to certain household duties. But we have held again and again that these trifling matters afford no basis for an opinion of mental incompetency to make a will."
In Leffingwell v. Bettinghouse, 151 Mich. 513, 515, 516, we said:
"The acts, conduct, and statements of testatrix relied upon as evidence of lack of testamentary capacity are instances of forgetfulness which are neither numerous nor remarkable. Habits of untidiness which increased with advancing years. This was not evidence of insanity. See Hibbard v. Baker, 141 Mich. 124. Stress is laid upon the fact that testatrix in her conversations would pass abruptly from one subject to another. * * *
"The utmost that can be said of this testimony is that she did not discuss a subject as fully as in the opinion of the witness it should have been discussed. According to this test, who would not be judged insane?"
In 28 R.C.L. p. 89, § 39, it is stated:
"An eccentric person may make a will, and eccentricity of conduct is not sufficient, of itself, to invalidate a will. Singularity should not be confounded with insanity, and eccentricities, bad manners, and grotesque conduct, generally, are not evidence of insanity, especially where they are normal to the testator."
The rule for determining mental competency was stated in the case of In re Walker's Estate, 270 Mich. 33, as follows:
"The test of mental capacity to make a testamentary disposition of one's property has been stated many times by this court. In general the requisite is that the testator must at the time of making his *Page 376 
will have sufficient mentality to enable him to know what property he possesses and of which he is making a testamentary disposition, to consider and know who are the natural objects of his bounty, and to understand what the disposition is that he is making of his property by his will."
The above rule was approved in the case of In re Getchell'sEstate, supra. In the case of In re Ferguson's Estate,239 Mich. 616, 627, we said:
"We state the well established rule: If Mrs. Ferguson, at the time she executed the will, had sufficient mental capacity to understand the business in which she was engaged, to know and understand the extent and value of her property, and how she wanted to dispose of it, and to keep these facts in her mind long enough to dictate her will without prompting from others, she had sufficient capacity to make the will. A testator may be suffering physical ills and some degree of mental disease and still execute a valid will, unless the provisions thereof are affected thereby."
The evidence in the present case shows that testatrix preserved the estate she inherited and generally managed her business affairs. Her will was prepared in pursuance of her instructions, and it should be noted that she expressly directed that certain of her properties were to be sold and others to be held by her trustee "as long as they are drawing good rentals." Applying the above-quoted test for determining testamentary capacity, it is clear that testatrix knew what properties she possessed, knew of contestant and other relatives, and understood the disposition she wished to make and was making of her estate. In discussing the question of mental incompetency, in the case of In re VerVaecke's Estate, 223 Mich. 419, 425, we said: *Page 377 
"When a man goes to an attorney, and, without aid or suggestion, directs the provisions of his will, and furnishes specific descriptions of all the property he owns, it is a waste of time to discuss the question as to whether he was mentally competent to dispose of his property as he did."
See, also, In re Littlejohn's Estate, supra; In re Walz'sEstate, 215 Mich. 118; In re Dowell's Estate, 152 Mich. 194; 28 R.C.L. p. 86, § 35.
Contestant argues that he was disinherited because his aunt was suffering from a delusion or false belief that he was a worthless character and was trying to get her property and money. He claims there was no basis for such belief or opinion. The only testimony indicating why testatrix omitted contestant from her will was that of the attorney who prepared the will and of her friend Mrs. La Marsh. The attorney's testimony, hereinbefore quoted, indicates that testatrix told him in substance that she was not leaving her relatives anything; that contestant had been trying to get money from her for a long time and that she considered him a worthless character. Mrs. La Marsh testified in part:
"Q. Did she (testatrix) ever make any statement as to the reason she was cutting Bob Bullard (contestant), her nephew, from any inheritance in her will?
"A. Well, she told me that at one time he had tried to borrow some money from her, and the reason, she told me, was because all his money went into expensive restaurants, that his wife couldn't cook. She wouldn't cook his meals, they ate mostly in expensive restaurants."
We note that contestant did not deny his aunt's purported statements that he had attempted to borrow *Page 378 
or obtain money from her. From her association with him and his wife and his attempts to obtain money from her, testatrix apparently had formed an opinion that he was a worthless person and was not entitled to any part of her estate. Such opinion may have been erroneous, but it certainly was not an insane delusion evidencing lack of testamentary capacity. Many people, without basis of fact, form uncomplimentary opinions about their relatives, but such opinions are not necessarily insane delusions. In Leffingwell v. Bettinghouse, supra, we said, p. 517:
"There is evidence that testatrix reached the conclusion that the contestants, particularly her son Henry, lacked filial affection for her. It is said that this conclusion was an insane delusion. It is possible that it was an erroneous conclusion, and for that reason a delusion. But it certainly was not an insane delusion. It was a conclusion reached by weighing evidence, and there was evidence to justify it."
In the case of In re Barlum's Estate, supra, we quoted with approval the following statement of the trial court in directing a verdict sustaining the will:
"The burden of proof is upon the contestant to show by competent evidence that at the time Thomas Barlum executed the will and the various codicils here offered, that he made this will as the result of a delusion — an insane delusion emanating from an unsound mind, and that in the absence of such insane delusions he would not have made this will as he did. An insane delusion exists when a person persistently believes supposed facts which have no real existence, and so believes such supposed facts against all evidence and probabilities and without any foundation or reason for the belief, and conducts himself as if such facts actually existed. *Page 379 
"In considering the question here presented, it is to be borne in mind that no capricious and arbitrary dislikes, unjustsuspicions, or prejudices against relatives or mistaken beliefsas to their feelings and designs toward him and his property,however visionary, nor belief of acts or facts which have anyevidential basis, constitute in law insane delusions. If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion, though on a consideration of the facts themselves, his belief may seem illogical and foundationless to the court; for a will, it is obvious, is not to be overturned because the testator has not reasoned correctly. The ultimate object of the inquiry is whether an insane delusion, destitute of all evidential support, spontaneously arising in testator's diseased mind, influenced him and operated directly against the contestant in this case." (Italics ours.)
See In re Balk's Estate, 298 Mich. 303; Jackson City Bank Trust Co. v. Townley, 268 Mich. 340; In re Bolger's Estate,226 Mich. 545; In re Haslick's Estate, 195 Mich. 432 (Ann. Cas. 1918 D, 466); In re Thayer's Estate, 188 Mich. 261; O'Dell v.Goff, 149 Mich. 152 (10 L.R.A. [N.S.] 989, 119 Am. St. Rep. 662); Rivard v. Rivard, 109 Mich. 98 (63 Am. St. Rep. 566);Haines v. Hayden, 95 Mich. 332 (35 Am. St. Rep. 566).
In 28 R.C.L. pp. 90, 91, § 40, it is stated:
"An unjust will is, however, not necessarily an irrational act, for a testator possessed of mental capacity may make an unreasonable and unjust will. * * * His aversion to his relations is not evidence of insanity, especially where he had reasonable grounds for disliking them, and, in general, the mere fact that a testator has exercised his lawful power to disappoint the reasonable expectations *Page 380 
of those nearest him * * * is not to be regarded as unreasonable in the sense of evidencing mental incapacity. Although it has been said that a will may contain dispositions which would cause insanity to be presumed, the generally accepted view is that the unnaturalness of a will does not raise a presumption of incapacity, or require the submission of the question to the jury."
In reviewing the judgment sustaining the will in the present case, we do not interpret or construe the provisions thereof or pass upon their validity.
Careful study of the record convinces us that testatrix was not suffering from an insane delusion regarding contestant. She apparently had formed an opinion that he was a worthless person and was trying to get her property and money. Such opinion or conclusion, which contestant claims caused her to omit him from her will, may have been erroneous, but it was not an insane delusion affecting her testamentary capacity.
We conclude that contestant failed to establish testatrix' lack of capacity to make the will in question. The testimony presented no question of fact for jury determination. The judgment for proponents is affirmed, with costs.
NORTH, C.J., and WIEST, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred. *Page 381