[Civ. No. 16392.   Second Dist., Div. Three.   Sept. 20, 1948.]

Estate of JOAQUINA ERRO ALEGRIA, Deceased. JOHN V. ALEGRIA, as Executor, etc., et al., Appellants, v. JOSEPH M. ALEGRIA, Respondent.

Robertson, Schramm, Raddue & Parma, Edw. W. Schramm and Alfred W. Robertson for Appellants.

Clarence C. Ward and J. V. Wood for Respondent.

VALLÉE, J.—Appeal from a judgment revoking probate of the will of Joaquina Erro Alegria entered upon a verdict of a jury finding that she was of unsound mind at the time she executed the instrument. Appellants also appeal from an order denying their motion for a judgment of nonsuit, from an order denying their motion for a directed verdict, and from an order denying their motion for judgment *"non obstante veredicto."*

Joaquina Erro Alegria died January 31, 1945. She left surviving her as her sole heirs three sons, John, Joseph (Joe) and Lorenzo, and one daughter, Anastacia. She left an estate valued at about $45,000. On February 26, 1945, an instru-

ment dated April 6, 1942, was admitted to probate as the last will of Mrs. Alegria. The instrument bequeathed $500 to Joe, and bequeathed and devised the residue of her estate to John, Lorenzo and Anastacia. It contained a noncontest clause.

On August 16, 1945, Joe filed a petition seeking revocation of probate of the instrument on three grounds: (1) unsoundness of mind; (2) want of due execution; and (3) undue influence of John, Lorenzo and Anastacia. The contest was tried by the court sitting with a jury. At the conclusion of contestant's case a motion for judgment of nonsuit was granted as to the issue of want of due execution. The jury found for the contestant on the other two issues. Thereafter the court granted a motion for a new trial on the ground that the evidence was insufficient to support the verdict. A retrial, with a jury, was had and at the conclusion of his case contestant dismissed the contest as to the issue of undue influence. The issue of unsoundness of mind was submitted to the jury which returned a verdict that Joaquina Erro Alegria was not of sound mind at the time she signed the instrument theretofore admitted to probate. Judgment followed revoking probate of the instrument. John, as executor, legatee and devisee, and Lorenzo and Anastacia, as legatees and devisees, appealed.

Upon the retrial contestant relied solely upon the ground that the testatrix had an insane delusion that Joe had attacked her and that this delusion caused her to practically disinherit him. There is no contention that Mrs. Alegria was of unsound mind in any general sense. The parties agree that the sole question on appeal is whether there is any substantial evidence to support the implied finding of the jury that Mrs. Alegria had an insane delusion that Joe had attacked her.

Mrs. Alegria was about 80 years of age when she made her will on April 6, 1942. She was 82 years of age when she died on January 31, 1945. Her husband, Patricio, had died in October, 1928. From the death of her husband until her death she lived on the home place of 184 acres, Refugio Rancho, in Santa Barbara County. From about 1929, she suffered from diabetes and was required to take insulin hypodermically, was in ill health and could not operate the ranch unaided. After the death of her husband, her son, John, and his wife lived on the ranch with his mother and operated it on a share basis until 1936, when he left to work

in the oil fields in Wyoming. After John's departure a man was hired to run the ranch and then it was leased for a short period. In 1937, Joe moved on the ranch under an oral agreement to operate it for his mother on a share basis.

In 1939, some difficulty arose between Joe and his mother, and a written lease, for a term from December 13, 1939, to November 1, 1940, was drafted and executed by Joe and Mrs. Alegria. The lease contained a provision that, during its term, Joe would make every reasonable effort to promote the physical comfort of his mother and keep pleasant relations. This provision was inserted in the lease at the insistence of Mrs. Alegria. Joe held over under the lease after it had run its term and continued to work the ranch under the terms of the lease.

During this time difficulties, concerning improvements on the ranch, developed between Mrs. Alegria and Joe. From 1938, until Joe left the ranch in 1941, they were constantly having trouble. At one time Mrs. Alegria thought that Joe was stealing her electricity and cut the old wires between her house and Joe's house. In the fall of 1939, Joe went into Mrs. Alegria's house one evening and showed his mother a receipt. She asked him for it. He said he would not give it to her. She reached for the receipt. He started out the door. She reached for him and held the back of his trousers and suspenders. Joe twisted around to get loose from her. She fell backwards on the floor, rolled 6 or 7 feet and against the wall. She was picked up by others present. After Joe had twisted his mother loose, he went on out. He did not say anything. He continued right on out. Mrs. Alegria was very excited at the time. She got a bump on the side of her head and "kind of passed out." She was given a glass of water and put to bed. Joe had been drinking at the time but was not drunk.

Early in November, 1941, Mrs. Alegria was building a new house on the ranch. Joe concluded that the contractor was not qualified to do the work. Mrs. Alegria told him to get rid of the contractor. Joe told the contractor to leave. The contractor then talked to Mrs. Alegria and she told him to continue to build the house. Joe became dissatisfied with the way the contractor was laying the flooring. Joe testified: "I went in the kitchen, told her that contractor was chiseling her. She chased me out of the house. Said, 'You ain't got nothing to do with it', and picked up a club and started hitting me with it. It was an old piece of kindling about four

feet long and three inches wide, and she started hitting me. I said, 'Mother, are you going crazy?' ''; that she hit him on the arm; that his wife came out at that time and told ''me not to touch her, leave her alone. I said, 'I am not touching her.' I said, 'I don't know what is the matter with her.' ''; that he did not strike his mother at all at that time; that he put his hand on her; that ''She had her head down. And I said, 'Mother, are you going crazy?' She let herself down on the knees. She laid herself on the flagstone. Of course, she started rocking herself like that (indicating). She picked herself up and went in her kitchen, and my wife and I stood and looked at her. She went in the kitchen, put an old hat on, and went towards the house; and I don't know from there what happened.''; that she attacked him ''With a stick, about three feet long and about three inches wide; hit me on the arm. I was trying to protect my face.—Yes, I looked at her. I put—I said, 'Mother, are you going crazy?' Then she laid herself down, like I said before.''; that he lifted her head and looked in her eyes; that ''She kneeled down, and I stepped out of the way. My wife, she said, 'Joe, don't touch her.' I said, 'I am not going to touch her.' '' He also testified that, at the same time, they had a discussion about a tractor, belonging to his mother, which he had leased; that ''The house [was] discussed first, and then the tractor; and then we went to the discussion of the house, and she got good and mad. Told me to get out of the kitchen. She walked out of the kitchen, picked up a club out of the kindling wood, started hitting me on the arm, hit me on the arm. I looked at her.''; that after he put his hand on her head, ''She laid down''; that he stepped back, looked at her and left. Joe weighed 260 pounds. Mrs. Alegria weighed a little over 100 pounds.

Immediately after this incident Mrs. Alegria left the ranch on foot. A Mr. Holden was driving on the road near the ranch. He stopped his car, assisted Mrs. Alegria into the back seat and drove to a ranch where, at the request of Mrs. Alegria, he telephoned her daughter or granddaughter. Mr. Holden asked Mrs. Alegria how she happened to be walking on the road at that time. She told him that she had had trouble with Joe; that she had hit him with a stick; that he had grabbed her by the hair and bumped her head on a stone wall or a pile of wood.

Shortly thereafter Mrs. Alegria went to the home of her granddaughter in Santa Barbara and then to the office of

the District Attorney of Santa Barbara County. She told the district attorney that Joe had been drunk on the ranch and was making a nuisance of himself; that the night before he had knocked her down to the ground and banged her head on the ground against a rock; that he had been in the habit of doing the same thing in the past. She exhibited bruises on her head to the district attorney. He asked her if she wished to file a criminal complaint against Joe. She said that she did not but that she wanted him off the premises. The district attorney wrote a letter to Joe saying he had been advised that Joe had committed a battery against his mother on November 7, 1941, and in order to avoid future difficulty his mother had requested that he (Joe) leave the premises not later than 30 days from that date.

Mrs. Alegria then consulted her own attorney, Mr. Schramm. She asked him what could be done to get Joe off the ranch. She told him that Joe had first come to the ranch under an oral agreement in 1937, on a crop share basis; that in December, 1939, Joe had signed a lease which ran to November 1, 1940, and that he had then stayed on under the same arrangement. She asked Mr. Schramm to file an action to get Joe off the ranch. She said that she had had difficulty with Joe for a period of time; that there was one assault just before the lease was made; that on November 7, 1941, they had had an argument over the leasing of a tractor; that on November 8, 1941, Joe had struck her on the head; that she grabbed a shingle and hit him on the arm; that Joe grabbed her by the arm, threw her to the ground and that his wife came out and took him away; that he was drunk; that Joe had taken after his wife with a gun. Mr. Schramm prepared and filed a complaint, which was verified by Mrs. Alegria, in which it was alleged that notwithstanding the provision of the lease, above referred to, Joe did on November 8, 1941, "by force, violence and with a strong arm, without excuse or justification whatsoever, strike, beat and pummel plaintiff herein, knocked her to the ground, and did then and there menace and threaten her with other and further actions of violence." Joe filed an answer in which he alleged that "on the 8th day of November, 1941, the plaintiff, without any cause therefor, attacked the defendant with a wooden cudgel, and thereupon the defendant, using only such force as was reasonable under the circumstances, defended himself from such attack."

On February 14, 1942, an agreement was entered into between Mrs. Alegria and Joe settling the controversy. The general effect of the agreement was that Joe left the ranch and Mrs. Alegria made a payment to him covering amounts due him for his share of certain crops and in purchase of his interest in certain personal property on the ranch. After the terms of the agreement of settlement had been agreed upon but before the agreement was executed, Mrs. Alegria told Mr. Schramm that she wanted to make a will. Mr. Schramm was about to enter the Army. He told Mrs. Alegria that whenever she wanted to have a will prepared she could come back and see one of his associates. About this time Mrs. Alegria told Attorney Alfred W. Robertson, an associate of Mr. Schramm, that Joe had hit her and knocked her down.

In March, 1942, Mrs. Alegria called on Mr. Raddue, an associate of Mr. Schramm, and asked him to prepare a will for her. In a conversation, which lasted about two hours, she told Mr. Raddue that "she wanted to leave all of her property with the exception of a dollar to Anastacia Alegria Arbelaitz, her daughter; John B. Alegria, her son; and Lawrence Alegria, a son; and she wanted to leave the other son, Joe, a dollar." She stated that Joe had treated her badly; that she had had a great deal of trouble with him for a period of years and that she felt that she did not want to leave him a thing except a dollar; that she thought the way to disinherit a person was to leave him a dollar. She told Mr. Raddue that she had been married once, gave him the name of her deceased husband, names of all of her children and their addresses, described her property to him, told him where her deceased husband had been buried in Calvary Cemetery, and that she wanted her funeral to be simple and inexpensive. She wanted John to act as executor. She told Mr. Raddue that she was certain Joe would contest her will and asked him what could be done with respect to that. He suggested that she put a noncontest clause in the will. Upon the suggestion of Mr. Raddue, the bequest to Joe was made $500 rather than $1.00 as a deterrent against Joe contesting the will. Mrs. Alegria left Mr. Raddue's office with the understanding that he would draft a will according to her directions.

Mr. Raddue then drafted a will and advised Mrs. Alegria, by letter, that he had done so. She returned to his office on April 6, 1942. Mrs. Alegria read the entire will. Mr. Raddue spent about an hour and a half going over the will with her, explained each sentence, and asked Mrs. Alegria if it ex-

pressed her intention. Mrs. Alegria stated she was completely satisfied with it. He then called in his. secretary and Mr. Alfred W. Robertson, who, with Mr. Raddue, acted as witnesses. At this time Mr. Raddue asked Mrs. Alegria if she had read, and was fully familiar with, the will and she said that she was. She signed the will and initialed each page. She changed the month of the date from March to April in her own handwriting. She asked Mr. Raddue what his fee was, and said she was going to place the will in her safety deposit box at the bank. Mr. Raddue and each of the witnesses to the will testified that Mrs. Alegria was of sound mind at the time it was executed.

The foregoing is all of the evidence to which we have been referred bearing on the question of whether Mrs. Alegria was, at the time she executed her will, laboring under an insane delusion that Joe had attacked her. A consideration of the evidence in the light most favorable to contestant (*Estate of Teel,* 25 Cal.2d 520, 526 [154 P.2d 384]) has convinced us that contestant produced no evidence which will support the verdict.

Every person of sound mind, over the age of 18 years, may dispose of his property by will (Prob. Code, § 20). ■ The presumption always is that a person is of sound and disposing mind. (*Estate of Arnold,* 16 Cal.2d 573, 586 [107 P.2d 25]; *Estate of Perkins,* 195 Cal. 699, 703 [235 P. 45].) The burden was upon the contestant to prove affirmatively and by a preponderance of evidence that the testatrix was of unsound mind at the time of the execution of the will and the evidence is to be considered in view of this burden which the law casts upon him. (*Estate of Perkins, supra; Estate of Dolbeer,* 149 Cal. 227, 230 [86 P. 695, 9 Ann.Cas. 795].) In disposing of her property, Mrs. Alegria was not called upon to consult the wishes or views of her heirs or of juries or courts; her own will was supreme. " 'The right of a testator. to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust.' (*Jackson* v. *Jackson,* 39 N.Y. 157.)" (*In re Spencer,* 96 Cal. 448, 452 [31 P. 453].)

■ Unsoundness of mind which will invalidate a will "must be an insanity of one of two forms, either insanity of such broad character as to establish mental incompetency

generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion." (*Estate of Chevallier,* 159 Cal. 161, 168 [113 P. 130]; *Estate of Perkins,* 195 Cal. 699, 703 [235 P. 45]; *Estate of Hess,* 183 Cal. 589, 596 [192 P. 35].) ▮ The possession of an insane delusion which leads a testatrix to dispose of her property otherwise than she would have done had she not possessed such insane delusion is sufficient to invalidate a will. But to have such effect the testatrix must have been actually possessed of a delusion, and it must have been an insane one. (*Estate of Selb,* 84 Cal.App.2d 46, 53 [190 P.2d 277].) In *Estate of Putnam,* 1 Cal.2d 162 [34 P.2d 148], the court said (p. 172): "An insane delusion has been defined to be the conception of a disordered mind which imagines facts to exist of which there is no evidence and the belief in which is adhered to against all evidence and argument to the contrary, and which cannot be accounted for on any reasonable hypothesis. 'One cannot be said to act under an insane delusion if his condition of mind results from a belief or inference, however irrational or unfounded, drawn from facts which are shown to exist.' (*Estate of Scott,* 128 Cal. 57, 62 [60 P. 527]; *Estate of Shay,* 196 Cal. 355 [237 P. 1079]; *Estate of Perkins,* 195 Cal. 699 [235 P. 45]; *Estate of Powell,* 113 Cal.App. 670 [299 P. 108].)" "An insane delusion is not only one which is error but one in favor of the truth of which there is not only no evidence, but regarding which there is the clearest evidence to the contrary. It is a delusion or conception which springs up spontaneously in the mind of a testator and is not the result of his belief or knowledge of any fact which would in reason or in probability furnish evidence in its support. The law upon this subject has been very fully and ably set forth in *Estate of Scott,* 128 Cal. 57 [60 P. 527]; *Estate of Allen,* 177 Cal. 668 [171 P. 686]; *Estate of Russell,* 189 Cal. 759 [210 P. 249]; *Estate of Perkins,* 195 Cal. 699 [235 P. 45]; *Estate of Shay,* 196 Cal. 355 [237 P. 1079]; and cases cited." (*Estate of Gunther,* 199 Cal. 119, 125 [248 P. 514]; *Estate of Horton,* 128 Cal.App. 249, 257 [17 P.2d 184]; *Estate of Struve,* 100 Cal.App. 255, 260 [279 P. 846].) ▮ It must be such an aberration as indicates an unsound and deranged condition of the mental faculties, as distinguished from a mere belief in the existence or nonexistence of certain supposed facts or phenomena based upon some sort of evidence. (*Owen* v. *Crumbaugh,* 228 Ill. 380 [81 N.E. 1044, 119 Am.St.Rep. 442, 10

Ann.Cas. 606].) ''If the belief or opinion has no basis in reason or probability, and is without any evidence in its support, but exists without any process of reasoning, or is the spontaneous offspring of a perverted imagination, and is adhered to against all evidence and argument, the delusion may be truly called insane; but if there is any evidence, however slight or inconclusive, which might have a tendency to create the belief, such belief is not a delusion. . . . '. . . It must be a delusion of such character that no evidence or argument will have the slightest effect to remove.' (*Merrill* v. *Rolston,* 5 Redf. 252.) [Citations].'' (*Estate of Scott,* 128 Cal. 57, 62 [60 P. 527]; *Estate of Shay,* 196 Cal. 355, 361 [237 P. 1079]; *Estate of Kendrick,* 130 Cal. 360, 364 [62 P. 605]; *Estate of Horton,* 128 Cal.App. 249, 257 [17 P.2d 184]; *Estate of Clark,* 100 Cal.App. 357, 371 [280 P. 204].) ▮ If there is any evidence, however slight or inconclusive, which might have a tendency to create a belief, such belief is not a delusion. (57 Am.Jur. § 82, p. 92.) ▮ An insane delusion does not exist, unless it is one whose fallacy can be demonstrated; for except such demonstration can be made, it cannot be said that no rational person would entertain the belief. (*Scott* v. *Scott,* 212 Ill. 597 [72 N.E. 708, 710].)

''Care must be taken to differentiate between mere unreasonable opinions and mental derangements. Testamentary capacity does not depend upon the testatrix' ability to reason logically or upon her freedom from prejudice. A belief may be illogical or preposterous, but it is not, therefore, evidence of insanity (*Estate of Scott,* 128 Cal. 57, 67 [60 P. 527]).'' (*Estate of Perkins,* 195 Cal. 699, 708 [235 P. 45]; *Estate of Powell,* 113 Cal.App. 670, 675 [299 P. 108]; *Estate of Struve,* 100 Cal.App. 255, 260 [279 P. 846].) ▮ Capricious and arbitrary likes, dislikes and mistrusts are not evidence of unsoundness of mind. (*Estate of Perkins, supra; Estate of Hess,* 183 Cal. 589, 596 [192 P. 35]; *In re Spencer,* 96 Cal. 448, 452 [31 P. 453].) ''Prejudices, dislikes, and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion.'' (*Estate of Kendrick,* 130 Cal. 360, 364 [62 P. 605]; *Estate of Perkins, supra; Estate of Schwartz,* 67 Cal. App.2d 512, 519 [155 P.2d 76].) ▮ The fact that a person dislikes his relatives, with or without reason, is not necessarily proof of unsoundness of mind. (*Estate of Perkins, supra.*) ''People may hate their relatives for bad reasons, and yet not be deprived of testamentary power.'' (*Es-*

*tate of Carpenter*, 94 Cal. 406, 419 [29 P. 1101].) A testatrix "has the right to make an unjust, or an unreasonable, or even a cruel will, and that no will may be legally set aside upon the mere establishment that it is such a will." (*Estate of Martin*, 170 Cal. 657, 663 [151 P. 138]; *Estate of Hinde*, 200 Cal. 710, 714 [254 P. 561].) "Irritability and bad temper may result in unnatural actions but they are not inconsistent with testamentary capacity." (*Estate of Presho*, 196 Cal. 639, 650 [238 P. 944].) (See, also, Schouler on Wills, § 162; 1 Underhill on Wills, § 94; 57 Am.Jur., Wills, § 80 et seq.)

The belief or inference must be "adhered to against reason and evidence." (*Estate of Calef*, 139 Cal. 673, 675 [73 P. 539].) It must be adhered to by the testatrix "against and contrary to reason, facts and evidence, up to and including the instant of the execution of the will." (*Estate of Horton*, 128 Cal.App. 249, 257 [17 P.2d 184].) To prove that the testatrix was suffering from an insane delusion it must appear that there was no basis for her belief and that attempts were made by reasoning to dispel it. (*Estate of Kendrick*, 130 Cal. 360, 370 [62 P. 605].) The court should not permit a jury to set aside a will " 'merely upon suspicion, or because it does not conform to their ideas of what was just and proper.' " (*Estate of Kilborn*, 162 Cal. 4, 13 [120 P. 762].)

With similar factual situations before them the courts have invariably held that an insane delusion had not been established. (*Estate of Carpenter*, 94 Cal. 406 [29 P. 1101], belief of testator that relatives had maltreated or abused him held not an insane delusion where there was no evidence that belief was unfounded; *Estate of Scott*, 128 Cal. 57 [60 P. 527], belief of testatrix that husband was unfaithful, was attempting to poison her and conspiring to place her in an asylum held not an insane delusion where based on fact husband had ceased having sexual intercourse with her, they occupied separate apartments in the house, and she had seen him with his arm around a family servant; *Estate of Kendrick*, 130 Cal. 360 [62 P. 605], belief of a testatrix that her sister had been trying to put her out of her house and had tried to kill her held not an insane delusion where sister had the keys to the house and had recorded a deed to the property given her by the testatrix on the understanding it was not to be recorded and had administered two doses of morphine to relieve her from pain; *Estate of Shay*, 196 Cal. 355 [237 P. 1079], belief of a testator that his daughter was addicted to

liquor and squandered her money held not to be an insane delusion; *Estate of Presho,* 196 Cal. 639 [238 P. 944], belief of testator that his wife was doping and poisoning him held not an insane delusion where based upon statements of a person in whom testator had confidence; *Estate of Gunther,* 199 Cal. 119 [248 P. 514], belief of testator that contestant had received and not made proper use of properties given him by testator held not an insane delusion where contestant had allowed taxes to go delinquent, properties had been sold for delinquent taxes, and judgment had been obtained against contestant and properties sold on execution; *Estate of Struve,* 100 Cal.App. 255 [279 P. 846], belief of testatrix that two sons had taken advantage of her by recording two deeds conveying property to them held not an insane delusion where testatrix had signed the deeds and placed them in escrow to remain until her death and sons had recorded the deeds and where, when the testatrix learned that they had done so, she apparently became very angry with them expressing to them and to others that they had violated the agreement that the deeds should remain in escrow until her death; *Estate of Selb,* 84 Cal.App.2d 46 [190 P.2d 277], belief of testatrix that daughter and grandson had "hounded her about her property" held not an insane delusion where based on their efforts to induce her to sell her home and go elsewhere; *In re Johnson's Estate,* 308 Mich. 366 [13 N.W.2d 852], belief of testatrix that her nephew was a worthless character and was trying to get her money and property held not an insane delusion where nephew had tried to borrow money from her; *Higgins* v. *Smith,* (Mo. App.) 150 S.W.2d 539, 543, belief of testatrix that her relatives were persecuting her and were mean and unkind to her held not an insane delusion where relatives had objected to her associating with a certain man, to her keeping late hours with him, and to her going to Philadelphia with him; *Firestine* v. *Atkinson,* 206 Iowa 151 [218 N.W. 293], belief of a testator that his illegitimate daughter was an immoral woman was not proof of an insane delusion where there was no evidence that the belief was harbored without evidence to support it; *Bain* v. *Cline,* 24 Ore. 175 [33 P. 542, 41 Am.St.Rep. 851], belief of a testator that certain of his children had wronged him by taking sides with their mother in a divorce suit, had testified falsely against him, did not respect him, and were trying to rob him of his property held not an insane delusion where the children had been witnesses in the divorce suit and testator thought they

all sympathized with their mother; *In re White's Will,* 121 N.Y. 406 [24 N.E. 935], belief of testator that his son, a Mason, was conspiring with testator's neighbors, also Masons, to deprive him of his rights held not an insane delusion where there was a dispute between the testator and his neighbors about the true boundary line between their contiguous properties and his son had combated his views and attempted to show him in error.)

The evidence is without conflict that the testatrix and Joe had frequent quarrels; that at her insistence a clause was put in a lease between them to the effect that Joe would keep pleasant relations; that on one occasion Joe had twisted loose from her causing her to fall and bump the side of her head; that shortly before Joe left the ranch his mother and he had quarreled; that he had his hand on her head; that Joe's wife told him to leave his mother alone, not to touch her; that testatrix had bruises on her head immediately thereafter; that he admitted using force on his mother in defending himself from her attack.

It cannot be said that there was an entire want of foundation for Mrs. Alegria inferring or believing that Joe had attacked her, or that her belief was the offspring of a perverted imagination, or that it sprang up spontaneously in her mind, or that it was the groundless and self-originating belief of a diseased mind, or that she imagined facts to exist of which there was no evidence, or that her belief was without any evidence, however slight or inconclusive, which might have a tendency to create the belief, or that it cannot be accounted for on any reasonable hypothesis, or that her belief was such an aberration as indicates an unsound and deranged condition of her mental faculties, or that it was not based upon evidence, however slight, or that it had no basis in reason or probability, or that her mind was so disordered that she imagined that Joe had attacked her. The circumstances which we have related offered some basis for the testatrix' belief that Joe had attacked her. The fact that there was this basis for the testatrix' belief, however mistaken or erroneous the conclusion drawn therefrom, distinguishes the belief from an insane delusion. Joe's testimony alone completely negates any basis for the implied finding that the testatrix suffered from an insane delusion. The facts related, however falsely Mrs. Alegria may have reasoned from them, if she did reason falsely from them, or however absurd her conclusions, if they were absurd, nevertheless furnished the evidence which in-

spired her inferences and the ground upon which her belief was founded.

The record is entirely devoid of even the semblance of any evidence raising even a suspicion that the testatrix was laboring under an insane delusion. The evidence entirely refutes a conclusion that the belief in the mind of the testatrix that Joe had attacked her was an insane delusion. The belief "did not originate in a diseased mind, but found color for its support in the matters that have been recited." (*Estate of Kendrick*, 130 Cal. 360, 366 [62 P. 605].) It was not a delusion, much less an insane delusion. A belief to be an insane delusion must be adhered to against reason and against argument. It must appear that attempts were made by reasoning to dispel the belief. There is no evidence in the record to indicate that the belief of Mrs. Alegria that Joe had attacked her, even if it was a mistaken belief, was adhered to against reason or argument. There is no evidence that an attempt was made by anyone to dispel her belief. Everyone to whom she expressed the belief accepted it as a fact.

The evidence does not meet the test prescribed by the law as a foundation for setting aside the solemn testamentary act of the testatrix. There is not a scintilla of evidence to overcome the presumption of soundness of mind or the positive testimony of the sound mental condition of the testatrix at the time the will was executed.

▪ An appeal does not lie from an order denying a motion for a judgment of nonsuit or from an order denying a motion for a directed verdict. (*McKee* v. *Lynch*, 40 Cal.App. 2d 216, 228 [104 P.2d 675]; *Hollenbaugh* v. *Wickersheim*, 114 Cal.App. 1, 2 [299 P. 90].) The attempted appeals from the order denying appellants' motion for a judgment of nonsuit and from the order denying their motion for a directed verdict are, and each is, dismissed.

The judgment is reversed. The order denying appellants' motion for judgment notwithstanding the verdict is reversed with directions to grant the motion.

Shinn, P. J., and Wood, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 18, 1948.