MARY A. SCOTT *et al.*

*v.*

LUTHER T. SCOTT.

*Opinion filed December 22, 1904.*

1. INSANE DELUSIONS—*insane delusion defined.* An insane delusion is a belief in something impossible in the nature of things, or impossible under the circumstances surrounding the person entertaining it, which no rational person would entertain and which refuses to yield to evidence or reason.

2. SAME—*belief in religious creed, in so far as it pertains to future existence, is not an insane delusion.* Belief in a religious creed, in so far as it pertains to an existence after death, is not an insane delusion, since there is no test by which it can be tried and its truth or falsity demonstrated.

3. SAME—*what is not evidence of an insane delusion.* Belief in Swedenborgianism and enthusiasm shown in promulgating its faith furnish no evidence of monomania, insane delusion or insanity.

4. APPEALS AND ERRORS—*in contest of will the Supreme Court will review the evidence.* In a will contest case which comes directly to the Supreme Court from the court of original jurisdiction, the Supreme Court, upon a proper assignment of error, will review the facts, and will reverse the decree if it is manifestly against the weight of evidence.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. B. R. BURROUGHS, Judge, presiding.

ALBERT B. OGLE, PERCY WERNER, and DILL & WILDERMAN, for plaintiffs in error.

WISE & McNULTY, (M. W. SCHAEFER, of counsel,) for defendant in error.

Mr. JUSTICE SCOTT delivered the opinion of the court:

Luther T. Scott, son and only surviving descendant of John C. Scott, deceased, filed a bill in the circuit court of St. Clair county to set aside an instrument which had been admitted to probate as the last will and testament of his

father. Such proceedings were had that the jury returned a verdict finding the purported will was not the last will and testament of the deceased, and after overruling a motion for a new trial, a decree was entered by the court at the January term, 1904, in accordance with the prayer of the bill, and defendants to that bill prosecute this writ of error.

John C. Scott died on February 21, 1902. The instrument which was admitted to probate as his last will and testament was executed on January 27, 1902. By the first clause he bequeathed to Luther T. Scott his stock in the Scott Printing Company, a corporation which had been organized by him and was engaged in business at East St. Louis; also "the presses, type, motors, paper cutter, imposing stones and all other material belonging to said corporation;" also certain other personal property, enumerating it; all the personal property so bequeathed being estimated by the testator as of the value of about $5500. By the same clause he devised to the son a dwelling house and the parcel of ground upon which it stands, in East St. Louis, estimated by the testator to be of the value of $4000, for the term of his natural life, and if any child or children shall be born to the son in legal wedlock, then to such child or children in fee; but if the son die without issue, then the remainder in said realty is bequeathed in fee simple "to the American Swedenborg Printing and Publishing Society located in the city of New York, for the sole use and purpose of publishing and circulating the theological writings of Emanuel Swedenborg." The second clause gives to his wife, Mary A. Scott, the remainder of his personal property; also four dwelling houses and the parcel of land whereon they stand, in the city of East St. Louis, estimated by the testator to be of the value of $14,000, for her natural life or so long as she remains his widow, with remainder in fee to the American Swedenborg Printing and Publishing Society (hereinafter, for the sake of brevity, referred to as the publishing society) for the same purposes as that for which the prop-

erty devised to it by the first clause was to be used. By the last clause, Mary A. Scott is nominated executrix.

To the bill filed by Luther T. Scott, Mary A. Scott and the publishing society were made defendants. The bill charges that John C. Scott, at the time of executing the instrument, was not of sound mind and memory, and further represents that its execution was secured by the undue influence of the defendants, Mary A. Scott and the publishing society. The defendants answered separately, each denying the allegation of lack of mental capacity and the allegation of undue influence.

It is urged that the verdict was against the manifest weight of the evidence, and that the court erred in overruling the motion for a new trial. The verdict was a general one, to the effect that the writing in question was not the will of the deceased. It is impossible to ascertain from the record upon which of the grounds stated in the bill, or whether upon both, the jury based their verdict.

At the time of his death, the deceased was sixty-seven years of age. He was then residing in East St. Louis. He had been for about twenty-five years a traveling agent in southern Illinois for the introduction of school books for the American Book Company and its predecessors in the same line of business. Prior to that time he had been for several years a county superintendent of schools in Richland county, in this State. He was a man of good education, of unusual attainments and excellent business capacity. During the war of the rebellion he was a soldier in the Union army, and thereafter was commonly referred to as Captain Scott. He was a member of a society, located at Olney, of the New Church, established by Emanuel Swedenborg. His moral standard was very high, and he led an exemplary life. His family consisted of the son, born of his first wife who had been dead several years, and of Mary A. Scott, his second wife. The extent of his real estate appears from the foregoing recitals from the will. The personal property, aside from

that devised to the son, was in value but a few hundred dollars, so far as appears from the inventory of his estate. That devised to the son consisted principally of seventy-eight shares of stock in the Scott Printing Company, of the par value of $50 per share. It appears that the presses and other property of like character bequeathed to the son, and which the will recites is the property of the Scott Printing Company, was in fact the property of that corporation, but that it had been bought by the testator upon his individual credit in January preceding his death and transferred by him to the Scott Printing Company. Upon what terms does not appear. Whether his act in bequeathing that property to his son indicates any lack of ability to comprehend the extent of his own property cannot be determined. If the corporation had not, at the time the will was drawn, fully paid him for this property, the language of the will would, we think, be thereby explained, as it was written by the testator himself, who was not familiar with the language one skilled in legal phraseology would have used for the purpose he had in view. The other personal property bequeathed to the son consisted of a desk and office furniture, a shot-gun, watch and chain, and wearing apparel. It is also shown by the evidence that his unsecured indebtedness is sufficient in amount to consume a great part of his personal estate, and that the real estate devised to the son was encumbered by a mortgage, securing an indebtedness of $1100. Fifteen hundred dollars of this indebtedness is a part of the purchase price of the property bought on his credit and transferred to the Scott Printing Company.

There is in this record no evidence whatever in support of the charge that the execution of the will was secured by the exercise of undue influence. It does not appear that either of the defendants knew that John C. Scott had executed a will until after his death, or that either of them had ever suggested to him that he make a will, except that the publishing society, which is a corporation organized for the

"sole object of printing, publishing and circulating the theological works and writings of Emanuel Swedenborg for charitable and missionary purposes," had circulated a printed pamphlet in the year 1900, which is designated a "memorial" and which is a history of the publishing society, describing the work in which it has been engaged, containing a copy of its articles of incorporation and of its constitution and by-laws, a list of donations, amounting to $171,000, which had been made to it during the first fifty years of its life from 1850 to 1900, together with a statement showing in what manner these donations were invested; containing also a list of books published by the society, and various other information of importance to persons interested in the Swedenborgian faith, and containing directions for the guidance of persons desirous of making provision by will for the uses of the society, with forms to be used for bequests or devises of various kinds of property, both real and personal. One of these memorials was found among the effects of the deceased after his death.

In the year 1901 he had written the secretary of the publishing society, stating that he had the memorial and inquiring whether the society could change its purpose by amending its by-laws, and, if so, what surety there was of the permanence of the society. In response he received a letter from the secretary quoting from the certificate of incorporation the paragraph designating the objects of the society's existence, and stating that that purpose could not be changed or altered, and calling attention, as evidence of the permanence of the society, to the amount of funds that had been bequeathed and the manner of their investment as shown by the memorial, and saying that the question was not whether the opportunities of the society to carry on the work will be diminished, but whether they will be increased "by means of as free and cordial support from New Churchmen, in the present and future, as it has had in the past." Captain Scott's letter does not suggest the possibility of his

making a gift or devise, nor does the letter request that he do so. So far as is shown by the evidence, this is the extent of the communications that had taken place between the publishing society and the deceased.

It cannot be said that the publishing society, nor any one on its part, had even requested the execution of this instrument, much less used any undue influence to cause the deceased to make any devise therein contained.

It was contended by the contestant, and stated by the bill in support of the other charges therein contained, that the testator in the later years of his life had become a believer in the religious doctrines of Emanuel Swedenborg and upon that subject was a monomaniac, wholly irrational, and that he had an insane delusion that he ought to give all his property to the publishing society.

The evidence shows that he had been a member of the "New Church" founded upon the teachings of Swedenborg for many years, and that he was an enthusiastic believer in its doctrines and was quite zealous in promulgating its theories among persons with whom he came in contact. It is shown that his son had led a somewhat dissolute life, which had been a source of great anxiety to the father. Money had been obtained by the father from his second wife to pay gambling debts of the son. Captain Scott nevertheless retained an unusually warm affection for his son and was very anxious to establish him in the printing business in East St. Louis, and was very hopeful that the son would be able to make a success of that business there. This desire he frequently manifested in conversations, both before and after the execution of the will, stating, according to some of the witnesses, that the son was to have all his property eventually. From the testimony of others it appears, however, that he had for several years contemplated a devise or bequest of a part of his property for the purpose of spreading the teachings of the theological writer who had founded the church of which he was a member, and that he consulted

with persons who were members of the same church in regard to the best method of carrying out his purpose.

The great majority of civilized human beings believe in the existence of a life beyond the grave. Based upon that belief, many religious creeds, differing widely, have been established. The fact that an individual holds any particular belief in regard to a future state of existence cannot, of itself, be evidence of an insane delusion or of monomania. An insane delusion is a belief in something impossible in the nature of things, or impossible under the circumstances surrounding the afflicted individual, and which refuses to yield either to evidence or reason. (*Riggs* v. *A. H. M. Society,* 35 Hun, 656; *State* v. *Lewis,* 20 Nev. 333; *Rush* v. *Megee,* 36 Ind. 80.) We have heretofore said that "insane delusion consists in the belief of facts which no rational person would have believed." (*Schneider* v. *Manning,* 121 Ill. 376; *Nicewander* v. *Nicewander,* 151 id. 156.) Such a delusion does not exist unless it is one whose fallacy can be certainly demonstrated, for except such demonstration can be made, it cannot be said that no rational person would entertain the belief. Consequently, no creed or religious belief, in so far as it pertains to an existence after death, can be regarded as a delusion, because there is no test by which it can be tried and its truth or falsity demonstrated. *Gass* v. *Gass,* 3 Humph. 278; *Orchardson* v. *Cofield,* 171 Ill. 14; *Buchanan* v. *Piric,* 205 Pa. St. 123.

It follows, therefore, that a belief in Swedenborgianism and enthusiasm manifested in propagating that faith furnish no evidence of monomania, insane delusion or insanity.

While the evidence of several witnesses indicates strenuous efforts on the part of the deceased to bring other persons to his way of thinking about religious matters, it does not show any greater zeal on his part than frequently characterizes those of orthodox faith whose sanity cannot be doubted.

The testimony of far the greater number of witnesses who testified on the subject is to the effect that he discussed

religion in a quiet and temperate manner as he discussed any other topic in which he was interested, and that if the person to whom he addressed himself disagreed with him and had fixed views, he dropped the matter and did not again refer to it.

On the day of his death he was at Vandalia, in this State, attending a teachers' institute, and during the afternoon he delivered an address to an audience of about one hundred and fifty persons—teachers and others. The subject was "child study," to the preparation of which he had then recently given considerable time. He was taken ill while speaking and died that night of apoplexy.

The witnesses in this case, both for the proponents and contestant, were of much more than average intelligence. Eleven witnesses, testifying on the part of the proponents, stated that the deceased was of sound mind and memory up to the time of his death. Among these were persons of a wide experience in the affairs of their respective communities which peculiarly qualified them to exercise an intelligent judgment in determining whether or not the testator was sane. Some of them had for many years sustained close business and social relations with him and had enjoyed the best of opportunities to form correct conclusions in regard to the matters about which they testified. They and other witnesses, testifying on the part of proponents, related circumstances and recounted occurrences in great detail which indicate very strongly that up to the day of his death, Captain Scott transacted business and passed among his friends and acquaintances discussing literature, agriculture and current events precisely as he had done for many years; that he was fully cognizant of the nature, extent and value of his property, of his obligations to his son and wife and of their claims upon his bounty, and that he was entirely sane.

Two letters written by the deceased were also offered in evidence on the part of the proponents, both addressed to his employer. The first is dated January 25, 1902, two days

before the execution of the will, and written from Carlisle, Illinois. It recites that he is there to attend a "quarterly meeting" of the Clinton county teachers' association, and advises the book company of the condition of its business and its interests in that town and county. The next is dated February 17, 1902, and was written from East St. Louis. It is a communication of some length and states that he had attended the "quarterly meeting" of the Madison county teachers' association on the preceding Saturday, and discusses with intelligence and coherence the advisability of certain work that he had in view for the company. Both letters indicate a mind entirely sound.

But six witnesses testified that he was not of sound mind and memory. We have carefully considered their testimony. In point of intelligence they were, we think, the equals of those who testified for proponents, but, on the whole, not as well qualified by knowledge and experience to judge of the sanity of another. A consideration of the reasons given by them as a basis for their opinions leads us to the conclusion that by far the greater weight of testimony was upon the side of proponents. It does appear from the testimony that the deceased had been in ill-health for several years; that he had undergone an operation for a bladder difficulty; that thereafter he had been deficient in nervous strength; that he was more easily exhilarated or depressed than in earlier years; that he lacked the ability to apply himself continuously to his business that he had formerly possessed; that his memory was not as good as it had been; that on account of his ill-health, he had been relieved by his employer of a portion of his duties and responsibility, and was in receipt of a much lower salary than he had formerly commanded; but all these things may be attributable to physical ills and advancing years and are not inconsistent with sanity. Only two of the witnesses for the contestant related any circumstances which seem to us a sufficient basis for their conclusion that he was not of sound mind and memory, and being

opposed by a much greater number of witnesses of equal intelligence, candor and fairness, with equal opportunities of knowing the condition of mind of the deceased and equally disinterested and whose conclusions appeal to us as the more reasonable, we think a new trial should be awarded.

In contests of this class, which come directly to this court from the court of original jurisdiction by appeal or writ of error, this court, upon a proper assignment of error, reviews the facts; and where, as here, the verdict is against the manifest weight of the evidence, the decree should be reversed. *Bradley* v. *Palmer,* 193 Ill. 15; *Schmidt* v. *Schmidt,* 201 id. 191.

The decree of the circuit court will be reversed and the cause will be remanded to that court for a new trial.

*Reversed and remanded.*