## In re ELSTON'S ESTATE.

### ELSTON et al. v. ELSTON et al.
### No. 35747.

Supreme Court of Oklahoma.
Oct. 13, 1953.

Jones & Wesner, Cordell, and Carder & Carder, Hobart, for plaintiffs in error.

J. T. Bailey, Cordell, for defendants in error.

BLACKBIRD, Justice.

The present proceedings contesting the will of the late Harry Elston arose as a result of his practical disinherison of four of his eight children. By the terms of said will, he bequeathed them, the above contestants, only $50 each out of an estate valued at more than $50,000. The remainder was all left to his other four children and his surviving widow, hereinafter referred to as proponents.

The issue in the contest, decided adversely to plaintiffs in error, as contestants, in both the county and district courts, concerned the testator's testamentary capacity. No question is raised herein concerning the testator's physical health or his mental competency with reference to business matters and ordinary affairs of life, there being an abundance of testimony by bankers, business men, and others with whom he had dealings, that the testator exhibited good judgment and acumen in such matters and was fully competent and sane. The only doubt sought to be injected with reference to the general issue of testamentary capacity relates to the testator's beliefs as a member of a religious sect known as "The Church of the First Born", which he joined while residing at Arnett, near the Fay community in Western Oklahoma, prior to 1910, and later upon removal therefrom, again affiliated with near Rocky, Oklahoma, remaining in the latter church or "Church Assembly" until his death there in 1952, at the age of 73 years.

According to the evidence, "The Church of the First Born" has no written creed or doctrine, its practices being governed by the teachings of its elders and ministers, which have been described as inspired "Prophets", authorized to speak for God. These teachings are based upon the Bible and express the minister's or prophet's interpretation thereof. The particular belief and teaching involved in this case is based upon Chapter 3, Verse 6 of the Book of Thessalonians, (11), as follows:

"Now we command you, brother (brethren), in the name of our Lord Jesus Christ, that ye withdraw yourselves from every brother that walketh disorderly, and not after the tradition which he received (of us)." (King James Version)

It appears that in or near the community in which the testator lived, the followers of this faith were divided into three separate groups, churches, or church assemblies, each of which took their names after their minister and were known as the Luke's or Holman, the 'Jack's or Merchant, and the Ott's or Cunningham Churches, which have no connection or association with each other, each believing that the other's prophets are false, misguided or not inspired. The testator belonged to the Holman group referred to in parts of the testimony as the parent or mother church. Apparently, in all three of these groups, members may be expelled or "rejected" by action of the elders for a number of offenses, including the use of tobacco and marrying a non-member, or "outside" the church. In case of such expulsion, rejection or excommunication, the members believe that under the above biblical quotation, they should "withdraw" and disassociate themselves from such former member. The extent to which this church's members go in their interpretation and practice of such withdrawal seems to have varied between the groups at different times. In this connection, beginning about 1910, the Holman group or parent church had an elder and preacher named Clay Tomalson or Thomason, who believed and taught that when a member was expelled or "rejected", the remaining members should not only withdraw from all association and social intercourse with him, but that in keeping with one statement in the parable concerning the Prodigal Son, (Luke, 15:16) " * * * no man gave unto him", they should see to it that no such former member received any gift, beneficence or bounty at the hands of the members, as long as he remained out of the church. As explained by one of the prominent churchmen who testified, the application of this doctrine or belief could extend, not only to withholding succor and sustenance to a child

150

or relative in need, but also to disinheriting him if he remained out of the church, which he could always re-enter upon application and "humbling himself" by acknowledging and seeking forgiveness for his former wrongdoing. The evidence was to the effect that the testator was a very devout follower and adherent of the Tomalson theory or interpretation, and tended to show that after the contestants were "rejected" from the church he had nothing more to do with them except to visit them on only two or three infrequent occasions for a few minutes during illness, and that, as these four of his children never returned to membership in the church, this religious belief was the reason they were given such small and disproportionate bequests in his will.

■ Contestants' position in this appeal is that the beliefs of the testator, above described, amounted to an "insane delusion" sufficient to invalidate his will. In their briefs they concede however that "whether religious views, commonly entertained by a considerable number of persons, are true or false, is not a subject for judicial inquiry." 57 Am.Jur. 90, Sec. 80. The reason for this, as stated in Scott v. Scott, 212 Ill. 597, 72 N.E. 708, is that no creed or religious belief, in so far as it pertains to an existence after death, can be regarded as a delusion, because there is no test (known to men) by which it can be tried and its truth or falsity demonstrated. They say, however, that the evidence is clear that the testator's beliefs alluded to were not common to other members of his denomination or sect, and that there is no evidence that any other member of the church at Rocky, Oklahoma, ever entertained the same views, though a few of the members at Fay, Oklahoma, did. They further assert that the testimony shows no single instance in which any member of the church ever excluded his children from inheritance on that ground. They also refer to O'Dell v. Goff, 149 Mich. 152, 112 N.W. 736, 10 L.R.A., N.S., 989, 119 Am.St. Rep. 662, in support of their view that though a religious faith may afford no evidence of insanity; it may destroy tes-

tamentary capacity where one of its believers thinks so continually or persistently upon that subject (as may be done on any other subject) that he becomes a monomaniac, incapable of reasoning where such subject is concerned.

■ We think the evidence in this case is sufficient to bring it under the rule above referred to excluding the truth or falsity of religious beliefs from judicial inquiry, and is insufficient to show that the testator's faith constituted an "insane delusion."

The church members better qualified to give information on the subject testified that both the Fay and Rocky churches subscribed to the doctrine of "withdrawal" from "rejected" members and indicated that members in good standing were supposed, in conformity with said doctrine, to refrain from having anything to do with "rejected" members. One or two witnesses indicated that as far as they knew this doctrine was not practiced in business matters nor did it forbid an inheritance from a member of a "rejected" or former member. However, the testimony also indicated that some of the members were more devout and stricter practitioners of the religion than others, the testator being of the former class. Even the witness, Clessie Tittle, admitted that the above quoted scripture believed by his church group, of more than one hundred members, to support the doctrine of withdrawal, could be interpreted to mean that the testator should not will the contestants any of his property. The witness, Orval Cunningham, an elder who belonged to the same group or "assembly" of the church as the testator, on cross-examination testified as follows:

"Q. And your interpretation of the scripture, and the great portion of the church members' interpretation of the scripture means when a member has been rejected by the church, expelled from the church, or withdrawn from the church, you should no longer associate with that person? A. Well, we just read that scripture that says: 'Keep no company.' It is up to the individual.

"Q. He interprets that as he sees fit? A. If he wants to abide by that scripture, it is left up to him.

"Q. If he goes further in his interpretation of that scripture to mean he shall also disinherit, he has the same bases for that as he otherwise had? A. Each individual places his own interpretation.

"Q. In the light of the church belief, it would be reasonable, he would have just as much scriptural authority to disinherit as to withdraw? A. He would have the same authority.

"Q. He would have the same authority to disinherit as to withdraw? A. If he interpreted it.

"Q. If he did that, saw it that way, would he be acting just as rational as any other member? A. If he saw it that way.

"Q. Would you say he had a reason on which to base that belief? A. Yes, I would.

"Q. If he is crazy for having believed that, the rest of you are crazy for having convicted views that you should not associate with them? A. That's right."

Of similar import was the testimony of other members or former members of the church, including Loyd West, who traced the development of, and more fully described, the doctrine of withdrawal as taught and advocated by the Elder or "Prophet" Tomalson, Thomalson, or Thomason. This witness testified positively that both the church at Rocky and the one at Fay practiced the doctrine. Although he indicated that the former did not go so far in applying it to business matters as the latter, he testified positively and specifically that the doctrine as taught and advocated by the above named leader included the disinheritance of children who had been expelled from the church and he stated repeatedly that the majority of the Fay church's members believed and followed such interpretation of the scriptures.

In view of the above, it cannot be said that the testator's belief that the contestants, having been rejected from his church a number of years before he executed his will, should not inherit the substantial portions of his estate that proponents inherited, was a belief peculiar to, and subscribed to by, him alone. On the contrary there is sufficient evidence to support the trial court's finding (inferable from the judgment) that similar views were "commonly entertained by a considerable number" of other members of his church, that we cannot say such judgment is clearly against the weight of the evidence. In this connection, see In re Wilkins' Estate, 199 Okl. 249, 185 P.2d 213, and In re Smith's Estate, 197 Okl. 405, 172 P.2d 328.

■ Though, as will be seen from the cases cited in the Annotations beginning at 175 A.L.R. 882 (including In re Robertson's Estate, 199 Okl. 582, 189 P.2d 615), the term "insane delusion" has been variously defined, we believe that the better definitions exclude a religious belief having a factual basis, especially where based upon a conclusion, whether correct or incorrect, peculiar or eccentric, if reached in a not altogether illogical manner. See also 57 Am.Jur. p. 88, Secs. 75, 76, p. 90, Sec. 80. In Owen v. Crumbaugh, 228 Ill. 380, 81 N.E. 1044, 1051, in which it was held that a belief in Spiritualism is of itself no evidence of monomania or insane delusion, the court said:

"An insane delusion is not established when the court is able to understand how a person situated as the testator was might have believed all that the evidence shows that he did believe and still have been in full possession of his senses."

Compare other expressions concerning "delusion" in the above case with those in In re Trich's Will, 165 Pa. 586, 30 A. 1053, 1056–1057, and see generally Page on Wills, Vol. 1, secs. 140–149, both inclusive.

In many of the cases in which various delusions, religious and otherwise, have been held to have superseded or influenced the testator's otherwise normal and natural desires in the matter of testamentary disposition so as to be said to have destroyed normal testamentary capacity, there was abundant evidence from other statements, beliefs, ideas or conduct of the testator that he was demented. In this case as in the last two cases cited above, See 81 N.E. 1044, 1050, and 30 A. 1053, 1056, there is

152

not a scintilla of such proof. As will be seen, the testator's belief was based upon evidence, i. e., passages from the Bible, a book that has probably been given a wider variety of interpretations (as witnesseth the great number and variety of religions and creeds) than any other. As hereinbefore indicated, most courts have rightly avoided holding that any such interpretation, literal or otherwise, constitutes proof in itself of mental derangement or testamentary incapacity. On principle, we find nothing in the beliefs of the testator and many of his fellow church members that is any more difficult to subscribe to than some of the beliefs adopted by better known denominations. In accord with the above views and on the basis of the evidence, all of which we have examined thoroughly, the judgment of the trial court must be and is hereby affirmed.

HALLEY, C. J., JOHNSON, V. C. J., and WELCH, CORN, DAVISON, O'NEAL and WILLIAMS, JJ., concur.

ARNOLD, J., dissents.