JOHNSON, C. J., WILLIAMS, V. C. J., and WELCH, CORN, DAVISON, BLACKBIRD and JACKSON, JJ., concur.

William L. SHELLENBERGER and W. R. Shellenberger, Plaintiffs in Error,

v.

J. W. LADD and J. W. Ladd, Executor of the Estate of Robert Howard Shellenberger, Deceased, Defendants in Error.

No. 36276.

Supreme Court of Oklahoma.

May 17, 1955.

Rehearing Denied July 5, 1955.

Application for Leave to File Second Petition for Rehearing Denied Oct. 11, 1955.

J. B. Moore, Frank Thomas, Ardmore, Charles A. Milor, Marietta, for plaintiffs in error.

J. W. Dixon, Crawford W. Cameron, Marietta, for defendants in error.

ARNOLD, Justice.

This is an appeal from an order and judgment of the District Court of Love County affirming the order of the County Court of Love County admitting to probate the will of Robert Howard Shellenberger, deceased.

The father and brother of the deceased filed their contest to the will on the ground of lack of testamentary capacity in that at the time of making the will the testator was suffering from insane delusions which materially affected the provisions of the will.

Upon trial de novo in District Court, the proponents of the will proved its execution and attestation and no question on that score is raised here. The will, bearing date of February 12, 1953, was introduced in evidence. Under its provisions all of testator's property, with the exception of minor cash bequests to testator's father, stepmother, two brothers, sister-in-law, niece, three nephews and two friends, was devised to one Virginia Dell Michael, a young girl not related in any way to testator.

The evidence of contestants is to the effect that the deceased, who was a man approximately 36 years of age, unmarried, with no children, committed suicide on April 4, 1953, by shooting himself while standing in a pond of water; that deceased was one of four children; that his mother divorced his father in 1923, when deceased was 6 years of age, and thereafter he and his brothers and sister were raised by their maternal grandparents; that his mother died in 1927 in the insane asylum where she was placed because she suffered from Huntington's Chorea, a nervous disease which is considered hereditary and which often causes delusions; that one of deceased's brothers, James, had been declared incompetent and had left home and had not been heard from for two or three years; that deceased's sister Mary Virginia, also suffered from Huntington's Chorea and died in the insane asylum in April, 1952; that after the grandparents took deceased and his brothers and sister to raise there was hostility on the part of the grandparents toward deceased's father; that deceased's mother cited his father for contempt on several occasions because of failure to pay the child support payments ordered by the court; that on the death of the grandparents they devised the greater part of their property consisting of quite large real estate holdings, to deceased and his brothers and sister; that after his sister's death deceased was angry when he learned that his father would inherit all of his sister's estate because her estate had come from the grandparents and the father had contributed in no way toward it; that after his sister's death deceased started to manifest some of the same physical symptons which she had such as a nervous twitching of the shoulders and began to "act peculiar"; that after his sister's death he lived alone at the old home place until

about January 1, 1953, when at deceased's request, his brother William and his family, consisting of a wife and four children, moved in with deceased; that things went smoothly for three or four weeks, then trouble developed; that deceased objected to rearrangement of the furniture and was dissatisfied with the preparation of his meals and the doing of his laundry; that he thereafter refused to eat with William and his family and took most of his meals in town; that he told several people that his brother William was trying to dispossess him; that deceased was a very religious man and an usher in his church and when his preacher came to see him and took William's side in the disagreement between William and deceased, deceased became very hurt, refused to attend his church and attended another church until the preacher apologized, after which he returned to his own church; that deceased refused to make up with William, although William and his family were willing for deceased to take his meals with them and do his laundry and were not trying to dispossess deceased; that deceased was a good business man, knew the nature and extent of his property, and knew who his nearest of kin were; the testimony of two psychiatrists, neither of whom had ever seen or examined deceased, was to the effect that, based on the testimony they had heard, deceased could have had Huntington's Chorea; that deceased was suffering from delusions; that it was common for persons suffering from Huntington's Chorea to have delusions and to commit suicide.

The evidence of proponents is to the effect that deceased had prior to the date of the will in question here made a will which left the major portion of his property to his niece and nephews; that in February, 1953, he went to see his lawyer, who had represented him in all his legal business in the past, and told him he wanted to destroy the old will and make a new one; that deceased told his lawyer that when William moved in with him William had told him his wife would do deceased's washing and that she had been doing it but it was not satisfactory and that the preacher had come out to see him and talked to him like a dog

and he, deceased, was badly hurt; that the lawyer took down the information as to whom deceased wanted to will his property and had deceased come back at a later date; that deceased came back, went over the will carefully, then executed it; that deceased then went to the bank, took his old will out of his lockbox and destroyed it and put the new one in and made arrangements for his lawyer to have access to the lockbox at any time; that deceased was a good business man; that he had acquired 200 acres of land of his own, in addition to that he had inherited from his grandparents, and took care of all his business in good fashion; about fifteen witnesses, all of whom had known deceased practically all his life and were close friends, neighbors, or business associates testified that deceased at all times appeared normal in every way, a good business man, and knew at all times the nature and extent of his property and those who were nearest him and what his family consisted of; the chief beneficiary under the will testified that she had known deceased about a year; that he came into the drugstore where she worked quite often; that she had never gone out with him or had any dates with him although he had asked her; that she treated him in the same way that she treated all the other customers who came into the drugstore; that she tried to be nice to everyone; that she had no idea why deceased had mentioned her in his will.

The District Court rendered judgment finding that at the time of the execution of the will deceased was of sound mind and knew the extent of his property and his next of kin and had testamentary capacity to execute the will; that the will was legally executed and valid and ordered the will admitted to probate. Contestants appeal.

Contestants urge that their evidence clearly shows that deceased was of unsound mind and laboring under a false delusion that his father and brother had mistreated him which caused him to attempt to convey his property in a channel in which it would not ordinarily go. They cite cases to the effect that a will induced by an insane delusion cannot stand and the test as to the

validity of a will of a testator laboring under an insane delusion is not his general testamentary capacity but whether the insane delusion materially affected the will, citing In re Robertson's Estate, 199 Okl. 582, 189 P.2d 615.

 Under the evidence outlined above the most that can be said is that deceased may or may not have had Huntington's Chorea and it may or may not have progressed to the point where he had insane delusions. The two psychiatrists who testified on the point had never seen or examined deceased and heard only contestant's evidence before testifying and answered hypothetical questions only, which questions assumed the point that deceased did, have delusions. Certainly there is ample evidence that deceased did not want his father to have any of the property which had been accumulated by the maternal grandparents, who were hostile to the father; there is ample evidence that friction developed between deceased and his brother, William, after the two families moved together—a not uncommon thing when two families attempt to inhabit the same house and certainly not a thing which of itself would prove that deceased was insane. Whether the incidents over which deceased and his brother quarreled were great or small we have no way of knowing, for the evidence does not disclose them, nor can we say whether deceased was justified in the attitude he assumed about them— few family quarrels in the eyes of strangers have a sensible basis. Even contestants admit that deceased was a good business man, that he knew the nature and extent of his property and knew his next of kin. The judgment of the court that deceased was of sound and disposing mind is not clearly against the weight of the evidence. Being of sound and disposing mind, deceased had a right to dispose of his property as he saw fit. In re Blackfeather's Estate, 54 Okl. 1, 153 P. 839; Parnacher v. Mount, 207 Okl. 275, 248 P.2d 1021. The fact that deceased left the major part of his property to a person who was not related to him and who had been kind to him in a merely casual way is not of itself

sufficient to show mental incapacity in Spron's Estate v. Herndon, 190 Okl. 149, 121 P.2d 602. The judgment of the trial court that deceased was not at the time of the execution of the will laboring under a false delusion which materially affected the disposition of his property is not clearly against the weight of the evidence.

Affirmed.