Daisy F. LYNN, C. W. McNeil, and Viola Roberts, Plaintiffs in Error,

v.

ADA LODGE NO. 146 OF the INDEPENDENT ORDER OF ODD FELLOWS and William B. (Bill) McCarty, individually, and as administrator with the Will annexed of the Estate of David Ray McNeil, deceased, Defendants in Error.

No. 40514.

Supreme Court of Oklahoma.

Jan. 12, 1965.

Carloss Wadlington, Ada, for plaintiffs in error.

Duard C. Willoughby, Ada, for defendants in error.

JOHNSON, Justice.

This is an appeal from a judgment of the district court affirming an order of the county court which denied contest and ordered admitted to probate the will of David Ray McNeil, deceased.

Testator, a bachelor, 57 years of age, died May 12, 1961, while a resident of Ada, Oklahoma, leaving as survivors a sister, brother and half-sister, all adults. The will, executed November 25, 1947, devised and bequeathed his entire estate, consisting of a small home and savings, a total not exceeding $5,000.00, to the Ada Lodge of the Independent Order of Odd Fellows. On July 18, 1961, one William B. McCarty, as an official representative of the Lodge, filed petition seeking appointment as executor of the will.

The named relatives who were heirs of deceased, hereinafter designated as plaintiffs, filed their contest asking that such purported will be denied probate because testator was incompetent, the will was not made and published in accordance with the law and was the result of undue influence exercised upon deceased by reason of ill feeling which he bore towards members of his own family. Plaintiffs' contest was amended to allege that testator was suffering from an insane delusion consisting of the insane belief testator's mother and sister had conspired to secure his commitment to a mental institution contrary to the

actual facts, and that the will was the result of such delusion.

At the hearing on contest of the will, the evidence disclosed testator had resided in Ada since 1937, at times having been employed as a night watchman. Testimony concerning execution of the will was elicited from a surviving subscribing witness who was a doctor, knew deceased suffered from epilepsy and had prescribed for his condition. There was testimony deceased was rational, had mental capacity to understand the nature and extent of his property, the relationship of those who had a claim upon his estate and the disposition which he desired to make of his property at the time the will was executed.

There was additional testimony elicited from a neighbor and a minister that deceased told these witnesses how he wanted his property to go upon his death and the terms of his will. The neighbor testified testator devised his property as he did because members of the lodge had secured his release from the mental hospital, and his sister had wanted to put him back there. On cross-examination this witness admitted deceased had told her the Odd Fellows got up a petition to secure his release and came up and got him out of the hospital, and that he liked the Odd Fellows and wanted them to have his property rather than his own relatives.

The minister, who had known and visited with deceased and knew he was epileptic, testified that he was a tithing church member and that he had willed his property to the lodge. The witness was of the opinion deceased knew the extent and value of his property.

Another witness, a member of the lodge, testified testator told the witness of having willed his property to the lodge; that he had several conversations with testator and was of the opinion he knew the nature and extent of his property and those persons naturally entitled to inherit. The witness knew nothing concerning whether the Odd Fellows had been involved in securing testator's release in 1947, and testator had said

nothing concerning this. The evidence also showed deceased was a lodge member but did not often attend meetings. There was no evidence tending to establish that the lodge members made any effort to secure testator's release from the mental hospital.

The attorney who drew the will and signed as an attesting witness testified same was prepared from information furnished by testator, who later read the instrument and declared that was what he wanted; testator's mother lived with him, and she was to be cared for during her lifetime; the will was executed properly and thereafter filed with the county judge; testator was cognizant of the relationship of those who might have been beneficiaries and knew what he was doing but did not mention why he wished the lodge to have his property.

For contestants there was evidence disclosing that sanity proceedings had been filed against testator; that he was hospitalized and discharged to his family against medical advice on October 1, 1947. Further evidence disclosing insanity proceedings against testator in December, 1949, and that a guardian ad litem had been appointed for him was offered for the purpose of showing the general condition of his mind relative to persecution complex concerning his relatives. However, the court sustained objection thereto upon the ground same occurred following execution of the will. Further evidence bearing upon a mental health proceeding in 1952 also was excluded.

Testator's sister, Daisy Lynn, one of plaintiffs, testified her brother had been an epileptic since early childhood and became excessively nervous as he grew older. Testator and their mother moved to Ada from Tonkawa in 1927 with witness but stayed only two months and returned to Arkansas, and then they were moved back to Ada in 1937. Testator had been in an epileptic hospital in Kansas and had been in Central State Hospital, Norman, on two occasions. On the first occasion testator had been picked up by police in Newkirk, Oklahoma, and later was taken to Norman. The family had nothing to do with his com-

mitment, and their mother secured his release by agreeing to take him out of the state to live with a half-sister. Later he was hospitalized at Parsons, Kansas, but did not like this, so the plaintiff's husband moved him to Ada.

Testator's mother signed the petition when he was committed to Norman August 7, 1947, upon discovering him tearing up the house. At the time he ran his mother away from home. In accord with their mother's wishes, plaintiff took the mother to the hospital, and they secured his release. The property where they lived had been purchased by their mother, although the deed was taken in his name, and testator and their mother lived together until he ran the mother away from home. After release from the hospital testator stated the Odd Fellows had gotten him released, and although there was no reason for such belief deceased carried this impression for the rest of his life. After release from the hospital, testator always was suspicious they intended to send him away again and feared they might do this, and on occasion would eavesdrop upon witness and their mother. The witness filed a sanity petition for his commitment in 1949 as a result of deceased having assaulted plaintiff, which would have led to filing of criminal charges except for her agreeing to the sanity charge. At all times following commitment in 1947 testator believed plaintiff and their mother were trying to get him out of the way, and the Odd Fellows would keep him out of the asylum; it was impossible to reason with him concerning such false belief, and witness was afraid of deceased and did not attempt to argue the matter.

Another witness (Mae Hester) testified that she met deceased in 1927; had lived next door from 1938 until his death and talked with him nearly every day. Upon his return from the hospital in 1947 he was mad at his mother and plaintiff, and when a little upset would bring up the subject of their trying to put him in Norman; this was on his mind constantly until he died; she told deceased this was not true, but his mind was not sound on this subject, and sometimes he raved against plaintiff and his mother and often it had been necessary for witness to keep him from assaulting his mother; his belief concerning persecution by plaintiff and their mother was unreasonable and the result of insanity; it was impossible for anyone to convince deceased that they were not trying to have him locked up; and testator declared he had willed his property so his family couldn't get his property; and the Odd Fellows had told him if he willed his property to the lodge he would not have to worry. On cross-examination the witness stated testator told her of having been in a mental institution, and always had it in his mind that plaintiff and his mother were going to send him away. The mother bought the home but put it in testator's name.

A local physician (Dr. Cowling), who had treated deceased since about 1940, testified that he had talked with him concerning his feelings toward members of his family. Testator told the doctor there was nothing wrong, but his family had him committed to get rid of him; that in the doctors' opinion testator had a persecution complex and was bitter toward his family; and he told the doctor they would send him back to Norman unless he watched his step. Testator always conveyed to the witness that this was his belief, although in the doctor's opinion there was no basis therefor and such belief was unreasonable and typical of a paranoid praecox; epilepsy was not the testator's only trouble; such belief if based upon facts that actually did not exist was an abnormal delusion. Testator's mother talked with the doctor a great deal about testator; the doctor did not know whether actual threats had been made; and the threat might have been a delusion, but deceased was under constant fear of being returned to the hospital.

There was additional redirect testimony by plaintiff, testator's sister, relative to his periods of hospitalization, the falsity of the belief which he had, and that such belief

concerning their plans to send him away was without foundation in fact.

At the conclusion of the evidence, plaintiffs amended the basis of their contest by alleging that the will offered for probate was the result of an insane delusion resulting from the insane belief that his mother and sister conspired to have him committed to the hospital intending to get him out of the way, which belief was contrary to fact, but testator could not be dissuaded therefrom and the will resulted from such belief.

Thereafter, the county court ordered the will admitted to probate upon the stated grounds that testator possessed the requisite mental capacity upon execution of the will and by reason of contestants having "failed to prove a lack of testamentary capacity."

The matter was appealed to the district court where the cause was heard de novo. By stipulation it was agreed the testimony introduced in the hearing before the county court could be considered as though again offered in evidence. Additionally, plaintiffs offered evidence tending to show testator's irresponsibility as well as evidence concerning hearings had at different times relative to testator's mental condition. There was further testimony from plaintiff bearing upon testator's physical and mental condition, the belief he had concerning his situation and the family's intentions and the possibility of dissuading him therefrom.

The trial court made findings of fact and conclusions of law to the effect that testator was competent at all times, and the will submitted for probate was executed according to law; that testator knew and understood the consequences of his act and that such will was not revoked; that testator was not suffering from an insane delusion, and the will was not a product of an insane delusion. The court's conclusions of law upheld the validity of the will, in all respects affirmed the county court and remanded the cause to that court for conclusion of the probate proceedings.

Plaintiffs' presentation of the appeal seeks reversal of the judgment upon the basis of two propositions, both of which are concerned with the sufficiency of the evidence to sustain the findings of fact and conclusions of law and the judgment based thereon. The first proposition advances a dual argument (1) that the findings and the judgment are not sustained by sufficient evidence and (2) the court erred in refusing to find the alleged will resulted from testator's insane delusion.

■ The record amply sustains that testator had sufficient mentality to meet the ordinary requirements of mental capacity. He knew the nature and extent of his estate. He knew the natural objects of his bounty and recognized his duties toward them. In fact, no contention is made in this case that he did not meet the ordinary requirements of mental capacity to make a will. The sole serious contention is that because of a persecution complex, an insane delusion, that his relatives had him committed to the asylum and a false notion that the Odd Fellows Lodge had caused his release, and that the will was the direct result of such delusion, that the will is invalid.

■ Conceding for the moment that such a delusion would invalidate the will, such question is one of fact. The two trial courts which heard this case determined that the testator did not labor under any delusion. In fact, the district court from which this appeal is perfected made the following specific finding:

"That the said David Ray McNeil was not suffering from any insane delusion and said will was not the result of any insane delusion."

■ The will involved was dated November 25, 1947. It is first necessary to dispose of the sanity hearings disclosed by the record. The first of these hearings was had at Tonkawa, Oklahoma, in 1926 or 1927. The record of the hearing appears to have been lost and is not in the transcript before us. By that hearing the testator

was sent to Central State Hospital for treatment for a short period. This is of no importance or probative value in any respect, being so remote.

The second hearing, and the only one close to the date of the will and prior thereto, was based upon a petition filed by testator's mother on August 7, 1947. An order for observation was dated August 8, 1947. He was discharged October 1, 1947, which was approximately two months prior to the execution of the will.

■ This court has repeatedly held that an adjudication of a testator's mental incompetency to manage his property is to be considered in the determination of his testamentary capacity, but such evidence is not conclusive proof thereof. See In re Shipman's Estate, 184 Okl. 56, 85 P.2d 317; In re Wheeling's Estate, 198 Okl. 81, 175 P.2d 317; and In re Nitey's Estate, 175 Okl. 389, 53 P.2d 215.

■ In regard to an adjudication of insanity, this court in the case of Moore v. Glover, 196 Okl. 177, 163 P.2d 1003, said that the same rule applied to an adjudication of insanity. The opinion says:

"An examination of the authorities appearing in the annotation will disclose that the authorities generally hold that an adjudication of insanity either before or immediately after the execution of the will does not constitute conclusive evidence of mental incapacity of the testator."

This is especially true where as in the present case the testator has been discharged and returned to normal life two months prior to the execution of the will. The determination of mental condition must be determined from other evidence.

As heretofore stated, the evidence establishes overwhelmingly the testamentary capacity of the testator under the ordinary standards of legal gauging. He knew the nature and extent of his property; he knew all of his relatives and his duties toward them; he was capable and did dispose of

his property according to a fixed purpose of his own.

■ It only remains to determine whether his condition at the time of the execution of the will was such as to show that the disposition which he made was brought about by a delusion and but for which delusion the disposition of the property would have been otherwise. Such delusion, if it existed, must have existed at the time of the execution of the will.

■ Such a delusion has been defined by this court in the first paragraph of the syllabus in Winn v. Dolezal, Okl., 355 P.2d 859, as follows:

"An 'insane delusion', within the rule invalidating will, denotes a false belief, which would be incredible in the same circumstance to victim thereof were he of sound mind and from which he cannot be dissuaded by any evidence or argument."

In the case of In re Elston's Estate, Okl., 262 P.2d 148, we said:

"Where a belief, religious or otherwise, is a creation purely of the imagination, it may be evidence of, or constitute, an insane delusion, but where it is based upon evidence and arrived at through a process of reasoning, though such reasoning may be regarded by the majority of other persons as faulty and illogical, yet, if it is not so contrary to reason that none but a person of unsound mind could entertain it, it is not such a delusion as may be deemed an 'insane delusion'; and though a testator's practical disinheritance of some of his children may have been prompted or brought about by such a belief, such fact, in itself, and without evidence of mental derangement or unbalance in other phases of life or demeanor will not invalidate the will."

The undisputed evidence in this case establishes that the mother of testator made the complaint which sent the testator to the asylum in 1947. Despite this, his will left her a life estate in all of his property. That

she sent him away is not a delusion but a fact. However, his will does not indicate that he resented it to the extent of excluding her from his bounty.

The sister, the only one of the contestants who was present at the trial, in telling of her relations with testator said:

"Whenever he needed help of any kind he always called on me * * * sickness or anything."

One would hardly call upon one he hated to help him.

In speaking of his epileptic fits, she limited his dislike of his family as follows:

"Well, when he was having them (fits) was when he was bitter towards mother and I because he thought we were the cause of them. * * *"

Thus it stands admitted that this hatred was only a periodic affair. Obviously, the will was not written during an epileptic fit.

One Dr. Threlkeld testified concerning the mental condition, but a careful consideration of his testimony fails to show anything that justifies the conclusion that the will would have been different if such mental condition had not existed.

In the case of Shellenberger v. Ladd, Okl., 288 P.2d 380, the syllabus by the court reads:

"The question of testamentary capacity is a question of fact and the finding of the trial court thereon will not be disturbed unless it is clearly against the weight of the evidence."

In the course of the opinion the court said:

" * * * The fact that deceased left the major part of his property to a person who was not related to him and who had been kind to him in a merely casual way is not of itself sufficient to show mental incapacity in Sporn's Estate v. Herndon, 190 Okl. 149, 121 P.2d 602. The judgment of the trial court that deceased was not at the time of the execution of the will laboring under a false delusion which materially affected the disposition of his property is not clearly against the weight of the evidence."

So we hold here. The judgment of the trial court is affirmed.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, BLACKBIRD, and IRWIN, JJ., concur.

WILLIAMS and BERRY, JJ., dissent.

BERRY, Justice (dissenting).

The majority opinion affirms the judgment entered by the district court on trial de novo, admitting the questioned will to probate, upon two grounds: (1) testator did not lack testamentary capacity; (2) determination of whether a will is the product of an insane delusion is a question of fact which was determined properly in the present case.

As to the first ground, it may be conceded there was sufficient competent evidence to support the finding that testator possessed testamentary capacity. At this point we note the majority statement that two courts found testator did not suffer from an insane delusion. It is noteworthy that the probate court made no finding upon this question, despite contestant's amendment of their grounds of contest in an effort to present such issue.

Despite evidence bearing upon the issue, the probate court sustained the will solely upon the stated ground:

"It is the opinion of the court that the testator possessed a requisite amount of mental capacity at the time of execution of the will, and the contestants have failed to prove a lack of testamentary capacity."

Decisional law generally recognizes that testamentary capacity may exist although the testator may be suffering from some insane delusion which will destroy validity of the will. 94 C.J.S. Wills § 18.

The majority opinion likewise deals with the principles that adjudication of incompetency, or of insanity, do not consti-

tute evidence of mental incapacity. Since these matters are not germane to the present inquiry, they cannot be considered as supporting the conclusion reached. In my opinion Syllabus 1 and 4 have no application to the present case.

The majority opinion falls into the same error made by the trial court in seeking to sustain the order of the probate court. This results from misconception of the question of whether testator labored under an insane delusion, since the problem is considered from the standpoint of testator's feelings toward members of his family as disclosed by the evidence. The existence of an insane delusion was not predicated upon the claim or evidence of testator's feelings toward his family engendered by their participation in his prior hospitalization. The asserted insane delusion was that the will resulted from his belief the defendant fraternal organization should be the object of his bounty, for the oft-declared reason this organization had secured his release from confinement in a state mental hospital.

In Syllabus 1 of Winn v. Dolezal, Okl., 355 P.2d 859, quoted in the majority opinion, we defined "an insane delusion". In In re Robertson's Estate, 199 Okl. 582, 189 P.2d 615, Syllabus 2 states this test:

"2. The test as to validity of will executed by testator laboring under insane delusion, is not whether testator had general testamentary capacity, but whether insane delusion materially affected the will."

In In re Williams' Estate, 207 Okl. 209, 249 P.2d 94, Syllabus 3 states:

"3. To defeat a will on ground that a testator lacked testamentary capacity, it is not sufficient merely to establish that the testator was a victim of some delusion, but the evidence must go further and establish that the will itself was the product of that delusion and that the testator devised his property in a way which, except for that delusion, he would not have done."

To this same effect see In re Mason's Estate, 185 Okl. 278, 91 P.2d 657; In re Wheeling's Estate, 198 Okl. 81, 175 P.2d 317.

An enlightening definition of an insane delusion appears in In re Cook's Estate, 63 Ariz. 78, 159 P.2d 797, at 802:

"[T]he conception of a disordered mind which imagines facts to exist of which there is no evidence and the belief in which is adhered to against all evidence and argument to the contrary, and which cannot be accounted for on any reasonable hypothesis."

The cited decisions adequately define the legal measuring devices for determination of the only issue involved. The testimony of Dr. C. (testator's attending physician since 1940) establishes without contradiction that testator was afflicted with "a persecution complex of a paranoid praecox." The evidence unequivocally establishes that the testator imagined the organization had secured his release from the hospital, although the uncontroverted evidence showed this to be untrue. The testator adhered to this belief despite all argument and evidence to the contrary. Had the testator not labored under such delusion it would have been a simple matter to have ascertained the truth regarding his belief, which certainly "could not be accounted for under any reasonable hypothesis". This was not merely a mistake as to the facts, but rather was a belief in a state of facts which did not exist, and which a rational person could not believe existed. In Re Robertson's Estate, supra.

The sole remaining question is whether such insane delusion materially affected the terms of the questioned will. Not an iota of evidence in this record appears to support the conclusion that, absent his expressed delusion, testator rationally would have considered the lodge as the proper object of his bounty to exclusion of his own blood. No support can be found for an attempted conclusion that the terms of the will were not affected materially by testator's insane delusion. . . .

It is my opinion the decision of the majority not only results in a miscarriage of justice in the present case, but that long-standing rules of law which should be controlling in such situations are effectively emasculated by determining the issue involved as a pure question of fact.

I dissent.